Argued and submitted March 10, 1999, judgment of conviction reversed, sentence of death vacated; remanded to circuit court with instructions September 14, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## SCOTT DEAN HARBERTS,
*Appellant.*

## (CC 89-0557; SC S41741)

11 P3d 641

Eric Cumfer, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief were Sally Avera, Public Defender, and David Groom, Deputy Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and David B. Thompson, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

LEESON, J.

Van Hoomissen, J., dissented and filed an opinion.

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

**LEESON, J.**

This is an automatic and direct review of a judgment of conviction and a sentence of death. *Former* ORS 163.150(1)(g) (1993), *renumbered as* ORS 138.012(1); ORAP 12.10(1). Defendant seeks reversal of his conviction on three counts of aggravated murder for the death of a young child. ORS 163.095; ORS 163.115. Defendant was arrested and placed in jail on July 14, 1989. His trial did not begin until July 12, 1994, nearly five years later. Under Article I, section 10, of the Oregon Constitution, the state must bring a defendant to trial "without delay." We hold that, under the circumstances of this case—five years between arrest and trial during which defendant was being held in jail solely on the pending charges, many months of unreasonable delay during that period, and both personal prejudice and prejudice to the defense caused by the five-year delay—the state violated Article I, section 10. Accordingly, we reverse the conviction, vacate the sentence of death, and remand the case to the trial court with instructions to dismiss the accusatory instrument with prejudice.

The victim in this case, a young child, lived with her father, the father's girlfriend, and the girlfriend's three young children. Defendant, a friend of the victim's father, also had lived in the house for approximately a year before the victim's death, where he was treated as a member of the family. During the evening of July 13, 1989, the victim's father purchased cocaine, and he and defendant cooked and smoked it together. Defendant, an admitted alcoholic, also consumed substantial amounts of alcohol that day and evening.

Defendant claims to have found the victim lying on the bathroom floor at approximately 3:00 a.m. on the morning of July 14, 1989, when he awakened to use the bathroom. Defendant then awakened the victim's father and the father's girlfriend. They both went to the bathroom, where they saw the victim. At defendant's urging, the father called 9-1-1. The father told the dispatcher that he was afraid that his daughter had swallowed some rubbing alcohol. While he waited for paramedics to arrive, the father hid the cocaine

paraphernalia that he and defendant had used the evening before. Meanwhile, defendant and the father's girlfriend attempted to revive the victim. After the paramedics arrived, defendant continued to perform chest compressions on the victim while the paramedics attempted to administer oxygen. When the paramedics asked defendant to step aside so that they could work, he became very upset. One of the paramedics, Rawson, testified as follows:

"Q: You started to mention that a person that you ultimately have come to know was [defendant], you started to describe some of his activities immediately following your setting up the oxygen and his being asked to move aside. Could you go ahead and elaborate on that, if you would, please?

"A: Well, he several times stated things like: Don't let my baby die, and loudly. He was really agitated. And at the time I assumed he was the father, because the other—the other man and lady were just kind of standing off on the side, not really too excited. They were just standing there. They kept telling him to settle down. So I just—you know, at the time assumed that he was the father and he was quite upset, and rightfully so."

Defendant repeatedly interrupted the paramedics' work by telling them that he knew how to perform CPR and that they were doing it wrong. The victim's father testified that he "tried to help restrain [defendant] and * * * tried to calm him down." When the police arrived, the paramedics asked the police to get defendant out of the way. One of the officers told defendant to sit down in a chair and stay there. When defendant did not do so, and again tried to reach the victim, he was arrested for harassing a police officer. According to Rawson, the police arrested defendant "just to get him away from us."

The victim apparently had died sometime between 10:30 p.m. on July 13 and 1:30 a.m. on July 14, 1989. The cause of death was head trauma, smothering, or a combination of the two. She also had been raped or sodomized.

After they arrested defendant for harassment, the police took him to the Clackamas County Jail and placed him

in a holding cell. Just before 6:00 a.m. on July 14, 1989, detectives told defendant that the victim was dead and began interviewing him. After defendant repeatedly had denied killing the victim, detectives asked him to take a polygraph examination, which he did. Detective Harvey, a polygraph intern, administered the examination, which lasted approximately four hours. Afterward, Harvey told defendant that she believed that he had killed the victim. Defendant responded that, although he did not remember killing the victim and could not believe that he would do something like that, if the polygraph had indicated he had killed her, he was "going along with what the polygraph said." Defendant made several other inculpatory statements, each of which referred to the results of the polygraph examination.

Defendant was indicted for murder on July 20, 1989. His trial was scheduled to begin on January 3, 1990. In November 1989, defendant moved to suppress all the inculpatory statements that he had made surrounding the administration of the polygraph examination. The trial court granted that motion on March 5, 1990. It found that defendant's blood alcohol level at the time when he made the statements was "approximately .16 to .18," that defendant had consumed cocaine, and that defendant had had "limited sleep and was fatigued" when he made the statements. The court also found that the first two-thirds of the polygraph examination were inconclusive, that Harvey had not given defendant "a complete and detailed explanation of what defendant's polygraph performance was," and that defendant probably would not have made the inculpatory statements if Harvey had not told him that the polygraph examination had led her to believe that he was the killer. The court concluded that, considering all the circumstances, defendant had not made the inculpatory statements voluntarily.

The court also found that "[a]ll statements by defendant at issue constitute polygraph evidence." Relying on *State v. Lyon*, 304 Or 221, 233-34, 744 P2d 231 (1987), and *State v. Brown*, 297 Or 404, 445, 687 P2d 751 (1984), the court held that such evidence was inadmissible as a matter of law. Finally, the trial court held that, as a factual matter, it could not "sanitize" or edit defendant's statements, because they were "inextricably linked and wedded to defendant's

understanding of the results of the polygraph and to what Detective Harvey told defendant." For those reasons, the court granted defendant's motion to suppress.

After the trial court granted defendant's motion to suppress the inculpatory statements, the state announced that it planned to appeal the trial court's order.[1] Defendant then filed a motion for release pending the state's appeal. Defendant argued that, in light of the trial court's rulings regarding the inadmissibility of defendant's inculpatory statements, there was not sufficient evidence to support the findings under ORS 135.240[2] that the proof was evident or the presumption strong that defendant was guilty. On March 5, 1990, the trial court denied defendant's motion for release. The court found "by clear and convincing evidence that the proof is evident and the presumption strong that the defendant is guilty." Accordingly, defendant remained in jail. On March 20, 1990, the state filed a notice of appeal from the trial court's suppression order.

In November 1991, the Court of Appeals reversed the trial court's suppression order. *State v. Harberts*, 109 Or App 533, 820 P2d 1366 (1991). It held that defendant had made the inculpatory statements voluntarily and that, as a matter of law, the statements could be edited to avoid any reference to the polygraph examination. *Id.* at 539-40.

Defendant sought review by this court and obtained two extensions of time to file his petition for review. The case was argued in September 1992, and, in February 1993, this

---

[1] ORS 138.060 provides, in part:

"The state may take an appeal from the circuit court to the Court of Appeals from:

"* * * * *

"(3) An order made prior to trial suppressing evidence[.]"

[2] ORS 135.240 (1989) provided, in part:

"(1) Except as provided in subsection (2) of this section, a defendant shall be released in accordance with ORS 135.230 to 135.290.

"(2) When the defendant is charged with murder or treason, release shall be denied when the proof is evident or the presumption strong that the person is guilty.

"(3) The magistrate may conduct such hearing as the magistrate considers necessary to determine whether, under subsection (2) of this section, the proof is evident or the presumption strong that the person is guilty."

court held that defendant had made the inculpatory statements voluntarily. However, it rejected the Court of Appeals' holding that, as a matter of law, defendant's statements could be edited in a manner that would eliminate reference to the polygraph examination without changing their meaning. *State v. Harberts*, 315 Or 408, 415, 848 P2d 1187 (1993). In April 1993, this court remanded the case to the trial court for it to determine whether it could eliminate defendant's references to the polygraph examination in his inculpatory statements without altering the meaning of those statements. *Id.* at 419.

On remand, the trial court again found that, as a factual matter, it could not edit defendant's inculpatory statements without changing their meaning, because the statements contained a "direct linkage to the polygraph." On May 27, 1993, the court again suppressed those statements. The state filed a timely notice of appeal from the second order of suppression. The state requested three extensions of time to file its opening brief, each time explaining that the Assistant Attorney General assigned to the case was working on other cases. Seven months later, on January 21, 1994, the state moved to dismiss the appeal, stating that it "no longer wishes to pursue this appeal." The Court of Appeals granted the state's motion and dismissed the appeal three days later.

Thereafter, the record reveals that nothing occurred to schedule the case for trial. On April 11, 1994, defendant wrote a letter to the State Court Administrator inquiring about the status of the case and explaining that he had been in jail awaiting trial since July 14, 1989. In response to defendant's letter, the trial court scheduled the trial for July 7, 1994.

On May 23, 1994, defendant moved to dismiss the charges against him for lack of a speedy trial. After a hearing on the motion, the trial court analyzed defendant's motion based on the factors that this court had identified in *State v. Ivory*, 278 Or 499, 564 P2d 1039 (1977): the length of the delay, the reasons for the delay, and prejudice to defendant. It found that the length of the delay—almost five years—"is extraordinary and shocking," and "unprecedented in the State of Oregon and perhaps unprecedented in the country as

a whole." As to the reasons for the delay, the trial court found that the period between July 14, 1989, the date of defendant's arrest, and January 3, 1990, when the trial originally would have begun, was "a minimum amount of time" to bring an aggravated murder case to trial. The court also found that the state had a "legitimate and statutory right" to appeal the court's first suppression order and that the Court of Appeals' decision put defendant in the position of petitioning for review to this court "or never again [having] a legal opportunity to challenge the [d]ecision in the future." Therefore, the court concluded, the period of delay caused by the first interlocutory appeal "cannot be laid at the feet of the defendant but at the same time cannot be wholly assigned to the State."

The trial court found that, although neither of the state's interlocutory appeals was taken to vex or frustrate defendant's desire for a speedy trial, the state's decision to file the second appeal was "less understandable and less benign" than the first appeal, and that both the attorney in charge of the second appeal and the Solicitor General always had " 'serious doubts' as to whether the appeal could be successful." According to the trial court, the decision to take that appeal was "a mistake in judgment."[3] The court also found that the conduct of the attorney in charge of the second appeal during the time that appeal was pending was "curious and questionable in light of the facts as [the attorney in charge] testified he knew them to be." According to the trial court, the seven months between when the state filed the second interlocutory appeal and when the state moved to dismiss that appeal was a period of "protracted indecision and unreasonably long under all the circumstances * * *."

With respect to prejudice, the trial court found that defendant had suffered actual personal prejudice by being held in jail for five years without a trial and by having aggravated murder charges against him unresolved for that period

---

[3] As to that finding, the trial court stated:

"The Court understands that this finding concerning faulty judgment is perhaps presumptuous and based upon 'Monday morning quarterbacking,' nonetheless, it is the Court's finding based upon a thorough examination of this record including the testimony of [the attorney in charge of the second appeal.]"

of time. However, the court also held that there was "no compelling and cogent evidence" suggesting that defendant's ability to defend himself had been impaired:

> "The position by the defendant that defendant's ability to receive a fair trial because of the extraordinary delay has been impaired is a reach on the part of the defendant as solid evidence supporting that position is not apparent to this Court."

On June 17, 1994, the trial court denied defendant's motion to dismiss, reasoning:

> "The consideration of all 'factors' including the circumstances mentioned above bearing on the question of prejudice have caused the Court to conclude that while the delay is extraordinary and shocking and has indeed prejudiced defendant Harberts by reason of his long pre-trial incarceration and the attendant anxiety and concern, this is counter-balanced by the nature of the charges against this defendant and the Court's Finding of February 28, 1990 [denying defendant's motion for release pending appeal because of a strong presumption of guilt] so as to render the prejudice defendant suffered to be of insufficient magnitude to warrant dismissal."

On June 28, 1994, after the case had been set for trial, defendant petitioned for a writ of habeas corpus in this court, which this court denied approximately a week later, on July 6, 1994. Defendant's trial began the following week. The jury convicted him of all three counts, and defendant was sentenced to death on October 27, 1994.

As a threshold matter, defendant assigns error to the trial court's denial of his motion to dismiss on speedy-trial grounds. The requirement for a speedy trial is both statutory and constitutional. ORS 135.747 requires that a defendant charged with a crime be brought to trial "within a reasonable period of time[.]" Article I, section 10, of the Oregon Constitution, provides, in part, that "justice shall be administered * * * without delay." The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy * * * trial." In this case, defendant sought dismissal of the

charges against him on both statutory and constitutional grounds.

■■ Procedurally, this court usually examines statutory claims first. *See, e.g., Ivory*, 278 Or at 503 (so stating). However, if defendant were to prevail on his statutory claim, the remedy would be dismissal of the charges without prejudice, and the state would be able to prosecute him again, because the charges against him are felonies. *See* ORS 135.753(2) (dismissal of charge under ORS 135.747 does not bar another prosecution for same crime if crime charged is Class A misdemeanor or felony); *State v. Emery*, 318 Or 460, 471 n 18, 869 P2d 859 (1994) (same). Therefore, even if we were to hold in defendant's favor on his statutory speedy-trial claim, we still would have to address his constitutional claims, because the remedy for those claims is dismissal with prejudice. *See Ivory*, 278 Or at 505 (remedy for Article I, section 10, violation is dismissal with prejudice, same as for violation of Sixth Amendment right to speedy trial, *citing Strunk v. United States*, 412 US 434, 440, 93 S Ct 2260, 37 L Ed 2d 56 (1973)). Defendant must prevail on his state or federal constitutional speedy-trial claims to be entitled to the complete relief that he seeks. Under those circumstances, therefore, it is appropriate to address defendant's constitutional claims first. *See Ivory*, 278 Or at 503 (same rationale for addressing constitutional speedy-trial claim first).

We begin with defendant's claim under Article I, section 10, of the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court decides state constitutional issues before resorting to federal law). In analyzing that provision, we consider its specific wording, the case law surrounding it, and the historical circumstances that led to its creation. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (explaining methodology).

By its terms, Article I, section 10, of the Oregon Constitution requires that justice be administered "without delay," a term that traces to Magna Charta. Note, *The Right to a Speedy Criminal Trial*, 57 Col L Rev 846, 847 n 7 (1957). At the beginning of the twentieth century, this court stated that Article I, section 10, "declares that justice shall be administered without delay, which is substantially the same

as guarantying to a defendant in a criminal action a speedy trial." *State v. Breaw*, 45 Or 586, 587, 78 P 896 (1904).

In the criminal law context, the requirement for a speedy trial is embedded deeply in the Anglo-American legal tradition:

> " 'The right of all persons held on a criminal charge, to a speedy and impartial trial, has been guaranteed from the earliest times to the English people, first by the Magna Charta and the petition of rights * * *. The * * * right has been declared in most of the constitutions of the American states, and also in the sixth amendment to the federal constitution.' "

*State v. Lee*, 110 Or 682, 685, 224 P 627 (1924) (quoting Freeman, 41 Am Dec 604). The historical reason for the speedy-trial requirement is prevention of prolonged pretrial incarceration. Sir Edward Coke's commentaries on Magna Charta, for example, explained that English judges did " 'not suffer[ ] the prisoner to be long detained, but at their next coming have given the prisoner full and speedy justice * * * without detaining him long in prison.' " *See Klopfer v. North Carolina*, 386 US 213, 224, 87 S Ct 988, 18 L Ed 2d 1 (1967) (quoting Coke, *The Second Part of the Institutes of the Laws of England* 43 (Brooke, 5th ed, 1797)). To Coke, prolonged pretrial incarceration not only would have been contrary to English law and custom, it would have been "an improper denial of justice." *Id.*; *see also* Note, *The Lagging Right to a Speedy Trial*, 51 Va L Rev 1587, 1594 (1965) (requirement of trial without delay protects defendants from "interminable pretrial imprisonment").

Colonial constitutions mandated trial "without delay" beginning with the Virginia Declaration of Rights of 1776, which phrased the requirement as a "speedy trial." Bernard Schwartz, 1 *The Bill of Rights: A Documentary History*, 234 (1971). The Kentucky Constitution of 1799, and the Ohio Constitution of 1802, guaranteed that "right and justice [be] administered without denial or delay." Charles Kettleborough, 1 *Constitution Making in Indiana* xx, 86 (1916). The Indiana Constitution of 1816 took its "substance and phraseology" from the Kentucky and Ohio Constitutions. *Id.* at xx. The Indiana Constitution of 1851 rephrased the

requirement as follows: "Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." *Id.* at 297-98.

The Indiana Constitution of 1851 was "the chief model for substance and phraseology" of the Oregon Constitution that was adopted in 1857. Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 28 (1926). The committee on the Bill of Rights submitted the text of Article I, section 10, to the convention as Article I, section 12. *Id.* at 120. There is no record of any discussion of the phrase "without delay." *See id.* at 310 (noting adoption without comment).

■ This court long has held that Article I, section 10, contains a "command * * * that justice shall be administered 'without delay[.]' " *State v. Clark*, 86 Or 464, 471, 168 P 944 (1917). That command is addressed to the prosecution and to the court. *State v. Crosby*, 217 Or 393, 402, 342 P2d 831 (1959). The state must not violate the constitutional speedy-trial mandate. *State of Oregon v. Kuhnhausen*, 201 Or 478, 512, 266 P2d 698, *on reh'g* 272 P2d 225 (1954).

■ Although there is "no general principle that fixes the exact time within which a trial must be had" to satisfy the requirement of Article I, section 10, *Kuhnhausen*, 201 Or at 492, the constitutional mandate means that "there shall be *no* unreasonable delay after a formal complaint has been filed against the defendant." *State v. Vawter*, 236 Or 85, 90-91, 386 P2d 915 (1963) (emphasis added). That requirement serves both a defendant's interest in a speedy trial and the public's interest in the prompt administration of justice. *See Brown*, 297 Or at 441 (delay in administration of justice a factor in determining admissibility of polygraph evidence). Whether the state has violated the constitutional mandate depends on the circumstances of each case. *Kuhnhausen*, 201 Or at 536. Pretrial imprisonment in connection with the pending charges "shortens the constitutionally permissible measure of delay." *Haynes v. Burks*, 290 Or 75, 83, 619 P2d 632 (1980); *see also Vawter*, 236 Or at 91 (even incarceration for unrelated offenses does not relieve state of speedy-trial obligations).[4]

---

[1] The dissent apparently would overrule that part of *Haynes* that declares that pretrial imprisonment shortens the constitutionally permissible length of delay.

Historically, the test that this court used to resolve speedy-trial claims was whether the process was "free from vexatious, capricious and oppressive delays, created by the ministers of justice * * *." *Clark*, 86 Or at 471 (citations omitted). In 1977, this court held that, consistent with that historical test, it would follow the same analysis that the United States Supreme Court had adopted in *Barker v. Wingo*, 407 US 514, 92 S Ct 2182, 33 L Ed 2d 101 (1972), to resolve speedy-trial claims under the Sixth Amendment to the United States Constitution. *Ivory*, 278 Or at 504.

Under *Barker*, the analysis begins with the length of the delay. Delay that is "presumptively prejudicial" is a "triggering mechanism" for inquiry into three other factors: whether the defendant asserted the right to a speedy trial, the reasons for the delay, and prejudice to the defendant. *Barker*, 407 US at 530. The *Barker* court rejected the argument that a defendant who fails to demand a speedy trial waives the right to a speedy trial. *Id.* at 528. Instead, it held that a defendant's failure to assert the right to a speedy trial is "one of the factors to be considered in an inquiry into the deprivation of the right." *Id.*

With respect to the reasons for the delay, the *Barker* court held that different weights should be assigned to different reasons. For example, a deliberate attempt by the government to delay a trial to hamper the defense weighs heavily against the government, while neutral reasons weigh less heavily. *Id.* at 531. However, even neutral reasons for delay must be weighed against the government, because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.*[5]

---

*See* 331 Or at 103 (Van Hoomissen, J., dissenting) (seriousness of the charges and importance of evidence to state's case excuses negligent delay in bringing defendants to trial).

[5] As noted, in *Ivory* this court explained that the speedy-trial provision in Article I, section 10, is equivalent to the speedy trial provided in the Sixth Amendment to the United States Constitution and that the *Barker* test generally is the appropriate methodology for testing the requirement of Article I, section 10. 278 Or at 504. In *United States v. Loud Hawk*, 474 US 302, 314, 106 S Ct 648, 88 L Ed 2d 640 (1986), the Supreme Court reaffirmed that "[t]he Barker test furnishes the flexibility to take account of the competing concerns of orderly appellate review on the one hand, and a speedy trial on the other."

With respect to prejudice to the defendant, the *Barker* court explained that such prejudice is to be assessed in light of the interests that the speedy-trial requirement was designed to protect:

> "This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown."

*Id.* at 532. The "prejudice to defense" factor has proved controversial in United States Supreme Court jurisprudence.[6] Nonetheless, the Supreme Court continues to apply the

---

[6] Within a decade of *Barker*, 407 US 514, the Court declared that the Sixth Amendment's speedy-trial guarantee is

> "not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."

*United States v. MacDonald*, 456 US 1, 8, 102 S Ct 1497, 71 L Ed 2d 696 (1982). The Court repeated that proposition in *Loud Hawk*, 474 US at 312, stating that "the Speedy Trial Clause's core concern is impairment of liberty[.]"

Nonetheless, in *Doggett v. United States*, 505 US 647, 648, 112 S Ct 2686, 120 L Ed 2d 520 (1992), the Supreme Court reversed a conviction on speedy-trial grounds when eight and one-half years had elapsed between the defendant's indictment and his arrest. The Court relied solely on prejudice to the defendant's ability to defend himself after such a long period of time. It held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim," because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655.

In dissent, Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, argued that the Speedy Trial Clause of the Sixth Amendment "does not come into play unless the delay impairs the defendant's liberty." *Doggett*, 505 US at 661 (Thomas, J., dissenting). Justice Thomas argued that the concern in *Barker* regarding preventing prejudice to the defense was merely *dictum* and that that *dictum* had not survived the Court's subsequent decisions in *MacDonald* and *Loud Hawk*. *Id.* at 664-65.

*Barker* framework in cases involving speedy-trial claims that are brought under the Sixth Amendment. *See Doggett v. United States*, 505 US 647, 112 S Ct 2686, 120 L Ed 2d 520 (1992) (applying *Barker* methodology).

This court has held that delay in and of itself may be sufficient to establish a speedy-trial violation if the delay is so long "that the thought of ordering [a] defendant to trial 'shocks the imagination and the conscience,' " *Vawter*, 236 Or at 96 (quoting *United States v. Chase*, 135 F Supp 230, 233 (ND Ill 1955)), or if the delay is caused purposely to hamper the defense, *Ivory*, 278 Or at 506. Short of those circumstances, however, this court considers the other factors.[7] If a defendant has been imprisoned for a long period awaiting trial, or if the government has caused the delay in bad faith, then prejudice is "obvious." *Ivory*, 278 Or at 508 (quoting *Dickey v. Florida*, 398 US 30, 53, 90 S Ct 1564, 26 L Ed 2d 26 (1970)). If a witness dies or disappears during the delay, the prejudice also is "obvious." *Id.* at 508 (quoting *Barker*, 407 US at 532). In cases in which inquiry into impairment of the defense is required, a defendant needs to show only that the delay caused a "reasonable possibility of prejudice" to the ability to prepare a defense. *Id.* at 508.[8]

---

[7] In *Haynes*, this court stated that

"whether there has been compliance with the constitutional injunction against 'delay' does not itself depend on prejudice to the defendant. Nor does it depend on defendant's demand for trial. Compliance as such depends on the length of the delay and the reasons for it."

290 Or at 81. In the state's view, that statement suggested that this court had abandoned altogether the prejudice prong in analyzing speedy-trial claims. In *State v. Mende*, 304 Or 18, 23, 741 P2d 496 (1987), this court made clear that, "despite the foregoing language from *Haynes*," prejudice remains a relevant factor in most cases involving speedy-trial claims.

[8] The state asserts that *Mende* adopted an "actual prejudice" test in place of the "reasonable possibility of prejudice" test in *Ivory*. We disagree. In *Mende*, the court held that the defendant, who had not been held in jail pretrial, had failed to demonstrate "any actual prejudice to his ability to prepare a defense." *Mende*, 304 Or at 22. The court explained that it used the term "actual" prejudice in that context because, "as a practical matter, and despite the foregoing language from *Haynes*, our prior cases all have required *in effect* that there be some degree of actual prejudice *to the ability to prepare a defense* to the charge in order to establish a constitutional violation of sufficient magnitude to justify dismissal of the criminal charge." *Id.* at 23 (emphasis added). *Mende* did not change the standard in *Ivory* or disavow this court's acceptance of the standard set out in *Barker* regarding the prejudice prong of the speedy-trial analysis.

██ ██ Although this court endorsed the *Barker* analysis in *Ivory*, it subsequently acknowledged that not all the *Barker* analysis is appropriate for evaluating claims under Article I, section 10. In *State v. Dykast*, 300 Or 368, 375 n 6, 712 P2d 79 (1985), for example, this court explained that it had been "mistaken" in adopting the requirement that a defendant demand a speedy trial. That is so because, as noted, the requirement that a defendant be brought to trial "without delay" is not a "right" of a criminal defendant. Rather, it is a mandatory directive to the state. *See Clark*, 86 Or at 471 (so stating). Accordingly, the burden to proceed promptly is on the state. *Vawter*, 236 Or at 87. Because Article I, section 10, does not guarantee an individual a "right" to a speedy trial, the second *Barker* factor is inapplicable under the Oregon Constitution. *Emery*, 318 Or at 468 n 13; *State v. Mende*, 304 Or 18, 21, 741 P2d 496 (1987); *Dykast*, 300 Or at 375 n 6.[9]

██ This court also has declined to follow the federal practice of balancing the conduct of the defendant against the conduct of the state in evaluating speedy-trial claims. *Mende*, 304 Or at 22. Rather, this court considers all the relevant factors, *Haynes*, 290 Or at 81, and assigns "weight" to them, *Mende*, 304 Or at 24. The length of delay affects the relative weight of each factor:

> "the longer the state unjustifiably delays a trial, the more heavily the 'reasons for delay' factor weighs in favor of the defendant. Similarly, the longer the defendant must endure pretrial incarceration or anxiety and other forms of personal prejudice, the more the 'prejudice to defendant' factor weighs in the defendant's favor. * * * Obviously, length of delay also may be a factor in assessing a defendant's claim that the passage of time has dimmed witnesses' memories or made other evidence unavailable."

---

[9] In this case, the state urges us to abandon *Dykast* and its progeny, and the dissent would do so. 331 Or at 108 (Van Hoomissen, J., dissenting). Abandoning *Dykast* would require us also to abandon the well-established principle that Article I, section 10, contains a mandatory directive to the state that is "not within the disposal of the parties[.]" *Haynes*, 290 Or at 80. This court also would have to overrule *Vawter* and hold that a defendant is responsible for insuring that a case is scheduled for trial. We disagree with the dissent that this court has erred in following an independent state analysis of Article I, section 10, rather than adopting the *Barker* methodology in its entirety.

*Mende*, 304 Or at 24 (citation omitted). Moreover, pretrial imprisonment shortens the constitutionally permissible measure of delay, even when that imprisonment results from denial of pretrial release in a murder case. *Haynes*, 290 Or at 83. In that regard, we note that the trial court in this case held that its finding of February 28, 1990—that the presumption that defendant was guilty and would not be released pretrial—"counter-balanced" the "extraordinary and shocking" delay in this case. That was error because, as noted, Oregon courts do not engage in a balancing of the speedy-trial factors, and pretrial incarceration shortens, rather than counter-balances, the constitutionally permissible measure of delay. *Haynes*, 290 Or at 81, 83.

■■ To summarize: Article I, section 10, imposes on the state a mandatory directive to bring a defendant to trial "without delay." Determining whether the state did so is a fact-specific inquiry that requires the court to examine the circumstances of each particular case. Under our present-day jurisprudence, speedy-trial claims are guided by considering the length of the delay and, if it is not manifestly excessive or purposely caused by the government to hamper the defense, the reasons for the delay, and prejudice to the defendant. Prolonged pretrial imprisonment, even if it is caused by the trial court's finding that the defendant is not entitled to release pretrial because of a strong presumption of guilt, shortens the constitutionally permissible measure of delay. With that framework in mind, we turn to the circumstances of this case, beginning with the length of the delay.

■ The pretrial delay in this case was two days short of five years. The length of the delay after an indictment has been filed not only triggers inquiry into the other factors, it remains an element of the inquiry in the examination of the reasons for the delay and prejudice. *Mende*, 304 Or at 24; *accord Doggett*, 505 US at 651-52 (uncustomary delay triggers inquiry into other factors and contributes to presumption that pretrial delay caused prejudice to accused). The state concedes that the five-year delay in this case is "more than sufficient" to trigger inquiry into the reasons for that delay. We agree. The state identifies no cases, and we have found none, involving such a long period of pretrial delay where the defendant was held in jail awaiting trial solely in

connection with the pending charges. However, the delay in this case was not so manifestly excessive that we may ignore the other factors. *Ivory*, 278 Or at 506. *Cf. Chase*, 135 F Supp at 233 (criminal charges dismissed because of 20-year delay before trial). We consider the other factors in turn, beginning with the reasons for the delay.

Defendant argues that "the lion's share of the delay was for the [state's] appeals which were ultimately unsuccessful, unduly lengthy, and negligently handled." He contends that the state's second interlocutory appeal was "especially weak" and added almost a year to an already unnecessarily long pretrial delay. The state responds that, under ORS 138.060(3), it had a right to take both interlocutory appeals and that "none of the time taken up in pretrial appeals should be considered" in analyzing a speedy-trial claim under Article I, section 10. The state reasons that the pretrial delay caused by the appeals in this case is "so benign as to exclude that period from the speedy-trial analysis."

The state's argument reduces to the assertion that, even when a defendant has been incarcerated pretrial, the state's statutory right to take an interlocutory appeal frees it from the constitutional mandate of Article I, section 10. For the state to prevail on that argument, this court would have to hold that the state's statutory right to appeal from a pretrial suppression order either defines or supercedes the constitutional command in Article I, section 10. In *Kuhnhausen*, this court rejected a similar argument.

*Kuhnhausen* involved a question of the meaning and application of Article I, section 10, in relation to the speedy-trial statute, *former* ORS 134.120 (1953), *renumbered as* ORS 135.747. 201 Or at 512. The state had argued that the statute, which was enacted contemporaneously with the Oregon Constitution, constituted the legislative construction and definition of Article I, section 10. This court held that the statute "is not a 'definition' of the constitutional provision * * *." *Id.* at 516. The court explained that determining whether a trial is a speedy trial is a judicial question that "should not be lightly whittled away by any rule which recognizes the power of the legislature to authoritatively construe the constitution." *Id.* at 517. The same reasoning is applicable here.

■ When the Oregon Constitution was adopted, and for more than a hundred years thereafter, the state had no right to take an interlocutory appeal from an order of suppression. The legislature enacted ORS 138.060(3) granting such a right in 1969. *See* Or Laws 1969, ch 529, § 1 (enacting provision as ORS 138.060(4), *renumbered as* ORS 138.060(3) in 1973, Or Laws 1973, ch 836, § 276). ORS 138.060(3) did not, because it could not, nullify the state's obligation under Article I, section 10, to bring an accused to trial "without delay." The state always must exercise its statutory right to appeal in a manner that is consistent with its constitutional obligation. Accordingly, we reject the state's argument that *no* delay caused by interlocutory appeals may be considered in analyzing a defendant's speedy-trial claim under Article I, section 10. Because ORS 138.060(3) does not shield the state from an inquiry into the reasons for the delay associated with its interlocutory appeals in this case, we turn to an analysis of those reasons for delay.

■ The state's first appeal raised the issues whether defendant had made his inculpatory statements voluntarily and whether his statements were linked to the polygraph examination so inextricably that they should be considered as "polygraph evidence" and excluded under *Lyon*, 304 Or at 233-34, and *Brown*, 297 Or at 445. As noted, the state prevailed at the Court of Appeals, and defendant sought review by this court. We accept the trial court's finding that the state filed and pursued its first appeal with reasonable diligence and that defendant was required to seek review of the Court of Appeals' decision or lose his opportunity to challenge that ruling in the future. Under those circumstances, we conclude that the decision to take, and the time devoted to the resolution of, the state's first appeal was consistent with the state's constitutional duty to exercise reasonable diligence in bringing defendant to trial. However, whatever the constitutional permissibility might be of holding a defendant in custody for four years without a trial, the passage of that amount of time changed the constitutional calculus under Article I, section 10, for what had to occur thereafter. That is so because, as we have explained, the core value protected by the speedy-trial requirement is prevention of prolonged pretrial incarceration.

By the time that the state's first interlocutory appeal was resolved, defendant had been held in jail without trial for so long that the state had an affirmative duty to bring him to trial without further delay, unless it had a strong justification for not doing so. Even assuming that the state had a strong justification for not bringing defendant to trial at that point, it was obligated to give this case the highest priority to remove any remaining barriers to trial. We turn to the justification for the period of delay following the resolution of the state's first appeal.

On remand from this court's decision in *Harberts*, the trial court made a factual finding that it could not edit defendant's inculpatory statements to omit reference to the polygraph examination without changing the meaning of those statements. Accordingly, on May 27, 1993, the trial court again suppressed the evidence of the statements, just as it had on March 5, 1990.

Soon after the trial court entered its second order of suppression, the Clackamas County Assistant District Attorney assigned to prosecute the case called the Appellate Division of the Attorney General's office to discuss the possibility of taking an appeal from the second order of suppression. The state's attorney in charge of the second interlocutory appeal testified that, when he received the prosecutor's call, he had doubts about the strength of the state's position if it were to file another appeal and was worried specifically about the length of time that defendant already had been in jail awaiting trial. As another witness, the Solicitor General, further explained:

"[Appellate Division attorneys] immediately were worried about how strong a case we could make on [the second] appeal since it was a fact intensive inquiry. In fact, fact intensive inquiries are the most difficult ones to get reversed in the appellate courts."

Nonetheless, the state filed a notice of appeal from the second order of suppression.

The trial court found that the decision to take the second interlocutory appeal was a mistake in judgment by the assistant district attorney and the Appellate Division. We

agree. A fact-bound interlocutory appeal that had little likelihood of success was not a strong justification for postponing the trial of a defendant who had been held in jail awaiting trial for four years.

Justification for the second appeal aside, we turn to the question whether the state gave this case highest priority to move defendant's case to trial, which, under the circumstances, it constitutionally was required to do. The attorney in charge of the state's second appeal testified that he made no effort to expedite the appeal within the Appellate Division. Rather, he testified that the Appellate Division "just handled [the second interlocutory] appeal as we would in the normal course." He requested and received three extensions of time to file the state's opening brief, explaining that he was "working on other cases." He testified that criminal defendants generally are released from jail pending an interlocutory appeal by the state and that usually only defendants charged with aggravated murder are held in jail pending a state's interlocutory appeal. He also testified that he could not think of "any other appeals during this time where we had a state's [interlocutory] appeal in a murder case where the defendant was being held in custody." The list of other cases that the attorney in charge gave priority over the state's second interlocutory appeal in this case grew longer, not shorter, with each request for an extension of time.

Seven months after the state had filed the second appeal, the state moved to dismiss it. The trial court found that the period of time that the state had spent on the second appeal was marked by "protracted indecision" and was "unreasonably long" under the circumstances. That is true. Even assuming that the state had a strong justification for the second appeal, and we already have concluded that it did not, the state failed to give this case the highest priority so that it could resolve the second appeal in a manner that was consistent with its obligation under Article I, section 10. Viewed in the context of the previous four years of delay, the state's failure to provide a strong justification for the second appeal, coupled with its failure to give this case the highest priority, means that the months of delay associated with the second appeal weigh heavily against the state in defendant's speedy-trial claim.

This case presents yet a further period of delay, for which the state provides *no* justification. Between January 24, 1994, when the Court of Appeals dismissed the second appeal, and April 11, 1994, apparently nothing happened to move the case to trial. The case was scheduled for trial only after defendant wrote to the State Court Administrator inquiring about the status of the case and explaining that he had been in jail awaiting trial since his arrest in July 1989. This court consistently has held that it is not incumbent on the accused to demand a trial or to take affirmative action to bring a case to trial, because the duty to bring a defendant to trial under the mandate of Article I, section 10, is on the state. *See, e.g., Vawter*, 236 Or at 87. As we have explained, in light of the preceding four years of delay, the state had an affirmative duty to give this case the highest priority to bring defendant to trial after resolution of the first appeal, unless it had a strong justification for not doing so. The state offers no justification for the months of inaction after the Court of Appeals dismissed the second appeal. Added to what by then had become almost five years of delay in bringing this incarcerated defendant to trial, those additional months of delay also weigh heavily in defendant's favor.

We turn to the prejudice factor. As noted, prejudice can be of three kinds: the damage arising from lengthy pretrial incarceration, the anxiety and public suspicion resulting from public accusation of a crime, and the hampering of the ability to defend at trial. *Ivory*, 278 Or at 507-08.

The state argues that, although five years of pretrial incarceration is serious "in the abstract" and defendant's situation "apparently is unprecedented in reported cases in Oregon," the "real type of prejudice relevant to a speedy trial claim is impairment of a defendant's defense." The state cites no authority for its argument that prejudice to the defense is the only relevant form of prejudice. That argument ignores one of the centuries-old principles that undergirds the speedy-trial requirement, namely, the purpose of preventing prolonged incarceration without trial. *See Klopfer*, 386 US at 224 (identifying principle). As this court stated in *Mende*, "the longer the defendant must endure pretrial incarceration or anxiety and other forms of personal prejudice, the more

the 'prejudice to defendant' factor weighs in the defendant's favor." 304 Or at 24. In this case, the trial court found that

> "[t]here has been prejudice to defendant * * * in being held in detention for almost five years without trial. There is also prejudice to [defendant] for a protracted period of anxiety concerning the pending serious charges (Aggravated Murder—potential death penalty) without trial."

We do not ignore that finding regarding the first two forms of prejudice.

The next question is whether the five-year delay in this case caused prejudice to the defense. As noted, the trial court found that there was "no compelling and cogent evidence" of prejudice to the defense. However, the trial court applied the wrong test. As we have explained, the proper inquiry is whether the delay caused a reasonable possibility of prejudice to the defense. *Ivory*, 278 Or at 508.

In this case, no direct evidence linked defendant to the crime. Defendant's defense theory was that the victim's father, either alone or with the help of the father's girlfriend, had killed the victim and that the state incorrectly had eliminated them as suspects. Defendant contends that his ability to prepare and present that defense was impaired in at least two ways.

Defendant first points to the fact that, in the bathroom where the victim's body had been found, the police found a bloody cigarette wrapper from the brand of cigarettes that the father smoked. The police also found several damp cigarettes of the brand that the father smoked in the garbage can in the bathroom. Defendant sought to establish that the cigarettes had been dropped into the garbage can near the time when the victim had been killed. His theory was that, if the police had found the cigarettes atop some damp tissues that the police also had found in the garbage can, that would suggest that the father had murdered the victim. The father had told the police on July 14, 1989, that he had dropped the cigarettes when he went into the bathroom and saw his daughter's body on the floor that morning. At trial in 1994, by contrast, the father testified that the cigarettes had fallen out of his pocket on the evening of July 13, 1989, when he had

taken the victim to the bathroom, and that he had put them in the garbage can.

On July 14, 1989, the father's girlfriend had told the police that she, not the father, had taken the victim to the bathroom the night before the murder. However, in 1994, at trial, the girlfriend testified that she could not remember whether it was she or the father who had taken the victim to the bathroom the night before the murder. Regarding the inconsistencies in their stories, both the father and his girlfriend testified that so much time had passed that they could not remember what they had told the police soon after the murder. The detective who had examined the bathroom was no help in resolving their inconsistencies, because she could not remember if she had found the cigarettes on top of, beside, or under the damp tissues.

Defendant argues that the passage of time provided both the father and the father's girlfriend with a plausible excuse for not remembering what they had told the police, thereby undermining defendant's ability to impeach their credibility with their prior inconsistent statements. The state, without discussion, dismisses defendant's argument as "mere speculation." We disagree. The state was required to prove its case against defendant beyond a reasonable doubt. The only other possible suspects in this case were the father and, perhaps, the father's girlfriend. It is not speculative to say that successfully impeaching their credibility could have established some doubt about whether the police properly had eliminated the father and the father's girlfriend as suspects.

Defendant makes a second argument respecting prejudice to his defense. Defendant asserts that the police who searched the house where the victim died did not do so carefully or thoroughly. An investigator, Graber, testified without contradiction that only one of the investigating detectives, Erickson, had searched the bedroom of the father and the father's girlfriend. Erickson, who did not prepare a detailed report of his search of that area, died in 1992. Accordingly, defendant argues, Erickson was not available as

a witness at trial, and defendant had no opportunity to question Erickson about how thoroughly he had searched the bedroom, what he saw, or whether Erickson could have overlooked evidence in the bedroom that would have created a reasonable doubt that defendant had killed the victim.

The state responds that Erickson's death "had no possibility of impairing defendant's defense." That is so, the state argues, because Erickson had "no unique knowledge" and defendant has not demonstrated that he would have said anything exculpatory. What is more, the state contends, defendant established through cross-examination of other detectives that "the search of the house was not as thorough as it could have been."[10]

We disagree with the state that Erickson's death was of no consequence to the defense. Although several detectives were involved in the search of the house where the victim died, Erickson was the *only* detective who searched the father's bedroom. Contrary to the state's assertion, Erickson did have "unique knowledge" of that area. Erickson prepared

---

[10] The dissent adds an argument that the state has not made regarding Erickson's death: Because Erickson died in 1992, during a period of reasonable delay, any prejudice that was caused by his unavailability at trial should not be factored into the speedy-trial inquiry in this case. 331 Or at 105 (Van Hoomissen, J.). The dissent asserts that, in *Ivory*, "this court * * * suggested that the date on which an allegedly prejudicial event occurred is important." *Id.* at 11. *Ivory* does not support that assertion. The court in *Ivory* stated that, with respect to proof of prejudice to the defense, post-indictment and pre-arrest delay "is inherently more damaging to [a] defendant's ability to obtain a fair trial," because a person who is unaware of the outstanding charge has "little inducement to preserve memories and evidence." 278 Or at 508-09. *Ivory* did not distinguish between reasonable and unreasonable delay for purposes of speedy-trial analysis.

The dissent contends that "allegedly prejudicial events should not be factored into the analysis if * * * they occurred during a period of *reasonable* delay." 331 Or at 105 (Van Hoomissen, J.) (emphasis in original). Apparently, the dissent would hold that, once long delay has triggered inquiry into the reasons for the delay, the length of the delay no longer is relevant in analyzing a speedy-trial claim. What is more, in the dissent's view, only prejudice that occurs during a period of unreasonable delay need be considered. Case law from the United States Supreme Court and this court establishes that the length of the delay is the "triggering mechanism" for inquiry into the other factors in the speedy-trial analysis and that the length of the delay "obviously" may be a factor in assessing the prejudice factor. *Mende*, 304 Or at 23-24; *Doggett*, 505 US at 651-52. As the *Barker* Court explained: "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors * * *." 407 US at 530. The *Barker* court also noted that, "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Id.* at 532. The Court referred to "a delay," not to "unreasonable delay."

several reports about the search of the house, but none of those reports described in detail the extent and nature of his search of the father's bedroom. Defendant's opportunity at trial to question *other* detectives, who had not participated in the search of the bedroom and whose police reports did not describe the search of that area, was no substitute for defendant's inability to question Erickson. What is more, contrary to the state's assertion, defendant was not required to show that Erickson would have said anything exculpatory. It is sufficient that defendant was deprived of the opportunity to demonstrate potential weaknesses in the state's case. When the state has the burden to prove its case beyond a reasonable doubt, a defendant need do no more. *See State v. Burrow*, 293 Or 691, 703, 653 P2d 226 (1982) (state must prove "every ingredient" of offense beyond reasonable doubt).

Defendant's impaired ability to impeach the credibility of the father and the father's girlfriend, and his inability to cross-examine Erickson, created a reasonable possibility of prejudice to the defense. Defendant has established all three forms of prejudice that this court has identified as relevant under Article I, section 10. The prejudice factor weighs heavily in defendant's favor.

This case involves the application of speedy-trial principles that were well established long before defendant was charged with the most serious charge that can be brought against a person, aggravated murder. The speedy-trial requirement addresses both a defendant's interest in having criminal charges resolved promptly and the public's constitutionally declared goal not to delay the administration of justice. *Haynes*, 290 Or at 81; *accord Barker*, 407 US at 527 ("society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest"). This court has held that there shall be no unreasonable delay after a formal complaint has been filed against a criminal defendant. *Vawter*, 236 Or at 90-91. This court also has stated that pretrial imprisonment of a defendant shortens, rather than lengthens, the constitutionally permissible delay that is tolerated under Article I, section 10. *Haynes*, 290 Or at 83.[11]

---

[11] As noted, the dissent would overrule parts of *Haynes*, thereby raising to at least five—*Haynes*, *Vawter*, *Dykast*, *Mende*, and *Emery*—the number of cases that

 As noted, this case involves a five-year delay in bringing to trial a criminal defendant who was held in jail solely in connection with the pending charges from the time when he was arrested in July 1989. Even acknowledging, as we do, the constitutional permissibility of the delay caused by the state's first interlocutory appeal from the trial court's first order of suppression, we may not ignore the passage of approximately four years from the time of defendant's arrest until resolution of that first appeal. At that point, the burden was on the state to provide a strong justification for any further delay in bringing this incarcerated defendant to trial. Assuming that the state had strong justification for any further delay after the first interlocutory appeal, it was required to limit that delay. Instead, the state chose to take a second interlocutory appeal, causing serious further delay. In that context, the state constitutionally was required to assign highest priority to resolution of that appeal so that the case could be set for trial. The state did not have strong justification for the second appeal, which it knew from the outset involved a fact-bound issue on which the state stood little chance of prevailing. The state compounded that mistake by failing to assign highest priority to resolution of the second appeal. Finally, the state failed to provide any justification for the months of inaction in bringing defendant to trial that followed dismissal of the second appeal. Defendant suffered

---

this court would have to disavow in whole or part for the dissent to prevail. The state was aware of *Haynes* and this court's view of the state's constitutional responsibilities throughout the events in this case.

Also, the dissent relies heavily on *Loud Hawk*, 474 US 302, for its view that no speedy-trial violation occurred here. That case provides false comfort to the dissent. In *Loud Hawk*, the delay between the defendants' indictment and trial was approximately seven-and-one-half years. Unlike defendant here, however, the defendants in that case were incarcerated for only a short period of time and were released without restriction during almost all the period of pretrial delay. 474 US at 309. The defendants in *Loud Hawk* did not assert their right to a speedy trial, *id.* at 314, and, unlike defendant here, they failed to demonstrate that the delay caused a reasonable possibility of prejudice to their defense. *Id.* at 316. Thus, the only question in *Loud Hawk* was whether the reasons for the delay—the government's appeals from a suppression order and subsequent order of dismissal—were sufficient to warrant dismissal of the charges on speedy-trial grounds. *Id.* The Supreme Court concluded that, standing alone, the reasons for the delay in that case did not warrant dismissal. *Id.* at 317. Significantly, the *Loud Hawk* court reaffirmed that "[t]he speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial[.]" *Id.* at 311 (quoting *MacDonald*, 456 US at 8).

both personal prejudice and a reasonable possibility of prejudice to his defense because of the five-year delay in this case.

On the facts of this case, which are unprecedented in Oregon, we hold that the state failed to bring defendant to trial "without delay" under Article I, section 10, of the Oregon Constitution. The trial court therefore erred in denying defendant's motion to dismiss the indictment for lack of a speedy trial. Accordingly, we have no choice but to order dismissal of the charges with prejudice. *See Emery*, 318 Or at 471 (dismissal with prejudice only adequate remedy for violation of constitutional speedy-trial violation).[12]

The judgment of conviction is reversed, and the sentence of death is vacated. The case is remanded to the circuit court with instructions to dismiss the accusatory instrument with prejudice.

**VAN HOOMISSEN, J.,** dissenting.

Defendant was convicted of aggravated murder and sentenced to death. The majority holds that the state failed to bring defendant to trial "without delay" and, therefore, violated Article I, section 10, of the Oregon Constitution. The majority reverses defendant's conviction, vacates his sentence of death, and remands the case to the trial court with instructions to dismiss the indictment *with prejudice*. For the reasons explained below, I respectfully dissent.

## FACTS

Defendant was charged with aggravated murder (three counts) in connection with the death of a child. The majority provides a detailed chronology of the events that occurred between the discovery of the child's body in 1989 and defendant's conviction in 1994.

When the trial court denied defendant's motion to dismiss the indictment on speedy-trial grounds, it found in part:

---

[12] In light of that holding, we need not address defendant's speedy-trial claim under the Sixth Amendment to the United States Constitution or his other assignments of error.

"5.

"The State in pursuing the appeals of the Trial Court's Orders of February 1, 1990 and May 27, 1993 were [*sic*] on both occasions in good faith and the appeals were not frivolous in nature and were not undertaken to vex or frustrate defendant's desire for a speedy trial and were [*sic*] not done to gain a judicial or competitive advantage in the trial that was to come."

Concerning the issue of trial prejudice, the court found:

"17.

"There is no compelling and cogent evidence that suggests defendant's ability to defend himself and receive a fair trial has been impaired.

"18.

"The position by the defendant that defendant's ability to receive a fair trial because of the extraordinary delay has been impaired is a reach on the part of the defendant as solid evidence supporting that position is not apparent to the court.

"19.

"The death of State's witness Detective Erickson in February 1993 has not materially adversely affected the defendant's chances of receiving a fair trial and presenting the kind of defense he would have presented had the case gone to trial in January and February of 1990 or in June of 1993. It is to be noted that Detective Erickson had already passed away prior to [the state's] decision to file the second appeal and pursue the three extensions of time before abandoning the appeal on January 21, 1994."

In denying defendant's motion to dismiss the indictment, the trial court explained:

"The consideration of all 'factors' including the circumstances mentioned above bearing on the question of prejudice have caused the Court to conclude that while the delay is extraordinary and shocking and has indeed prejudiced defendant Harberts by reason of his long pre-trial incarceration and the attendant anxiety and concern, this is counter-balanced by the nature of the charges against

this defendant and the Court's Finding of February 28, 1990 [denying defendant's motion for release pending appeal because of a strong presumption of guilt] so as to render the prejudice defendant suffered to be of insufficient magnitude to warrant dismissal."

In *State v. Ivory*, 278 Or 499, 504, 564 P2d 1039 (1977), this court adopted the four *Barker* factors for the purpose of analyzing a claim of "undue delay" under Article I, section 10. *See Barker v. Wingo*, 407 US 514, 530-33, 92 S Ct 2182, 33 L Ed 2d 101 (1972) (explaining "factors"). This court later held that it was mistaken in adopting one of the *Barker* factors, *i.e.*, whether the defendant asserted the right to a speedy trial. *State v. Dykast*, 300 Or 368, 375 n 6, 712 P2d 79 (1985).[1] Thus, the other three *Barker* factors—the length of the delay, the reasons for the delay, and the resulting prejudice to the defendant—make up the present analysis under Article I, section 10. *State v. Emery*, 318 Or 460, 468 n 13, 869 P2d 859 (1994). In my opinion, the majority's analysis of the case law surrounding Article I, section 10, as well as its application of that case law to the facts of this case, is seriously flawed. I proceed to demonstrate where, I believe, the majority goes astray.

## LENGTH OF THE DELAY

The majority concludes that the length of the delay in this case was not so manifestly excessive that we may ignore the other *Barker* factors. 331 Or at 88-89. I agree. This court never has characterized a pretrial delay as sufficient, because of its length alone, to justify dismissal under Article I, section 10. *See State v. Vawter*, 236 Or 85, 96, 386 P2d 915 (1963) (describing the standard of automatic dismissal as being a delay that "shocks the imagination and the conscience").

## REASONS FOR THE DELAY

I note first that the majority significantly mischaracterizes one of the state's arguments regarding the reasons

---

[1] For the reasons explained *post* I conclude that *Dykast* was decided incorrectly. However, even without considering defendant's failure to demand a speedy trial, I would hold that Article I, section 10, was not violated in these circumstances.

for the delay to be that the state's right to appeal under ORS 138.060(3) "trumps" Article I, section 10.[2] The state does not make that argument. Rather, the state argues that its appeals were statutorily authorized *and* temporally reasonable and, therefore, did not violate Article I, section 10.

The majority correctly concludes that

> "the decision to take, and the time devoted to the resolution of, the state's first appeal was consistent with the state's constitutional duty to exercise reasonable diligence in bringing defendant to trial."

331 Or at 90. Thus, the majority recognizes that at least 80 percent of the pretrial delay in this case, *i.e.*, from July 1989 until June 1993, was constitutionally unobjectionable. According to the majority, it is what occurred thereafter that precipitated the constitutional violation.

The state's second appeal caused about seven and one-half months of delay. The majority chastises the state for taking the second appeal, concluding that the state lacked "strong justification" for doing so. As did the trial judge, the majority engages in "Monday morning quarterbacking."

When evaluating the "justification" for pretrial delay, I find the reasoning of the United States Supreme Court in *United States v. Loud Hawk*, 474 US 302, 106 S Ct 648, 88 L Ed 2d 640 (1986), to be persuasive. *See State v. Kennedy*, 295 Or 260, 267, 666 P2d 1316 (1983) ("when this court cites federal opinions in interpreting a provision of Oregon law, it does so because it finds the views there expressed persuasive, not because it considers itself bound to do so"). The *Loud Hawk* Court emphasized that

> "there are important public interests in the process of appellate review. The assurance that motions to suppress evidence or to dismiss an indictment are correctly decided

---

[2] The majority states:

"The state's argument reduces to the assertion that, even when a defendant has been incarcerated pretrial, the state's statutory right to take an interlocutory appeal frees it from the constitutional mandate of Article I, section 10."

331 Or at 89.

through orderly appellate review safeguards both the rights of defendants and the 'rights of public justice.' "

474 US at 313. *Loud Hawk* instructs that

"an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay. In assessing the purpose and reasonableness of such an appeal, courts may consider several factors. These include the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and—in some cases—*the seriousness of the crime.*"

*Id.* at 315 (emphasis added). In my view, it is eminently sensible to evaluate interlocutory appeals by looking to the strength of the state's position, the importance of the appealed issue to the state's case, and the seriousness of the crime.

In this case, the state had strong justification for a second appeal. At the time when the state decided to appeal the second suppression order, the suppressed evidence appeared to be critical to the state's case. No *direct* evidence, other than the suppressed statements, linked defendant to the crime. The physical evidence, to some extent, was ambiguous. Some of the evidence could have been interpreted to suggest that the victim's father and/or the father's girlfriend had committed the crime. Without defendant's inculpatory statements, the state's case against defendant was entirely circumstantial. Defendant himself concedes that, without the suppressed statements, the state's case against him was "significantly weakened." Indeed, during his closing argument at trial, defendant's counsel told the jury:

"There were three adults in this house when this [murder] happened. * * * There are no witnesses to this crime, there are no admissions, there are no confessions, there are no eyewitnesses whatsoever. There is no direct evidence linking anyone to this crime, none."

In my view, the prosecutor's decision to take a second appeal was fully justified under the circumstances. The state's position was not as strong as it had been during the first appeal, however, given the seriousness of the charges against defendant and the importance of the suppressed statements to the state's case, I believe that the state acted

with strong justification in taking and pursuing its second appeal. The majority's conclusion to the contrary represents a judgment call with which I cannot concur.

Moreover, the majority ignores the fact that, by voluntarily moving to dismiss its second appeal, the state no doubt *advanced* defendant's trial date by at least a year. In my view, the state's action in dismissing the appeal weighs in favor of the state because it demonstrates the state's good faith effort to comply with Article I, section 10, even at the risk of jeopardizing the prosecution of the case by going to trial without the evidence of defendant's incriminating statements.

The Attorney General did not give the state's second appeal the priority it required. Even assuming, however, that the Appellate Division's handling of the state's second appeal was negligent, this court has stated that, although negligent delay weighs against the state, it does not weigh as heavily as intentional misconduct by the state. *See Dykast*, 300 Or at 377-78 (intentional or malicious acts intended to injure a defendant or gain unfair advantage weigh "much more heavily than inadvertent or negligent conduct"). Moreover, the record here contains abundant and unchallenged evidence of the Appellate Division's heavy caseload at the relevant time. *See Strunk v. United States*, 412 US 434, 436, 93 S Ct 2260, 37 L Ed 2d 56 (1973) (in determining whether Sixth Amendment was violated, delay caused by understaffed prosecutors weighs less heavily than intentional delay calculated to hamper defense).

Finally, the majority faults the state for not bringing the case to trial promptly after the Court of Appeals dismissed the state's second appeal. However, in my view, even assuming that the District Attorney's failure to set the case for trial promptly was due to negligence, given the seriousness of the charges against defendant, the remaining few months of pretrial delay simply are insufficient to show a state constitutional violation.

## PREJUDICE

Defendant was incarcerated for almost five years. During that period, he undoubtedly experienced some anxiety and concern. In my view, however, that type of prejudice is not entitled to much weight in the analysis.

Here again, the majority mischaracterizes the state's argument to be that the *only* type of prejudice that is relevant under the prejudice prong of the analysis is prejudice to the defense. The state does not make that argument. Rather, the state argues that, of the three types of prejudice that can be caused by pretrial delay, the "most serious" is impairment of a defendant's ability to present a defense. *See Barker*, 407 US at 532 (so stating). In fact, in its respondent's brief in this court, the state specifically acknowledges:

"Although less serious than impairment of defense, pretrial delay also may prejudice a defendant by reason of incarceration and anxiety."

Courts have recognized that anxiety and concern are inherent in any criminal prosecution and have not given them much weight. *See, e.g., United States v. Simmons*, 536 F2d 827, 831 (9th Cir 1976) ("Conclusory allegations of general anxiety and depression are present in almost every criminal prosecution."). In *Dykast*, 300 Or at 378, this court recognized that "[m]ost criminal prosecutions cause stress, discomfort and interference with a normal life." And, in *Emery*, this court gave little weight to the defendant's claims of anxiety, explaining:

"We recognize that delay adds to the ordinary anxiety and inconvenience caused by the pending criminal charge, however, there was no cognizable prejudice to defendant."

318 Or at 473. Under Article I, section 10, pretrial anxiety and concern, although ostensibly entitled to some weight in determining whether a defendant was prejudiced by delay, appear not to factor significantly.

## TRIAL PREJUDICE

The majority factors Detective Erickson's death into the "prejudice to the defense" prong of the *Barker* analysis. Erickson died in 1992, before this court resolved the state's first appeal. In my view, allegedly prejudicial events should not be factored into the analysis if, like Erickson's death, they occurred during a period of *reasonable* delay.

The majority apparently believes that the "prejudice to the defense" prong is intended to evaluate the cumulative effect of all changes in circumstance between the time of

defendant's arrest and the time of trial, regardless of the timing of the events that led to those changes of circumstance. Article I, section 10, however, does not confer on a criminal defendant a right to a trial in the identical format that the trial would have taken if it had commenced on the day the defendant was arrested. Instead, that provision mandates that the state avoid "unreasonable delay" in bringing the matter to trial (or other resolution). Logically, then, dismissal of charges is intended to remedy any prejudice to a defendant *caused by* the state's failure to avoid unreasonable delay. Oregon case law supports the view that Article I, section 10, was not intended to provide a remedy for *all* prejudicial events that might occur before trial.

First, Oregon courts have established that one of the purposes of Article I, section 10, is to "limit the possibility" of impairment to a defendant's ability to put on a defense. *Dykast*, 300 Or at 378. When the state avoids unreasonable delay, it *limits* the possibility of prejudice to the defendant. However, the state cannot *eliminate* that possibility. Holding the state responsible for prejudicial events that occur when the state is meeting its constitutional obligations can do little to effectuate the purpose of limiting the possibility of prejudice.

Second, this court has suggested that the date on which an allegedly prejudicial event occurred is important. In *Ivory*, the defendant was indicted secretly in January 1975, but was not arrested and did not learn of the indictment until December 1975. 278 Or at 501, 509 n 8. The defendant moved to dismiss, claiming that he had been prejudiced by the disappearance of two witnesses. After concluding that the period of delay between the indictment and the arrest was unreasonable, this court noted that those witnesses had been seen last in March 1975 and June 1975, respectively. The court went on to find that the defendant had demonstrated prejudice "by identification of potentially favorable witnesses who could not be found *due to a delayed trial.*" *Id.* at 508 (emphasis added). The *Ivory* court appears to have factored the prejudicial event (the disappearance of the witnesses) into the analysis because the witnesses had disappeared *during* a period of unreasonable delay.[3]

---

[3] It appears that only one federal court has addressed the issue whether a prejudicial event must occur during a period of unreasonable delay to be factored into

I concede that prejudicial events that occur during periods of reasonable delay occasionally might factor into another element of the constitutional calculus, such as the "reasons for·the delay" prong of the *Barker* analysis. For example, when the state learns that a defense witness has fallen terminally ill and has limited time to testify, it is reasonable for the state to expedite the trial or otherwise to perpetuate the witness's testimony. In such a case, the state has warning of an impending prejudicial event, and a failure to expedite trial or to preserve the evidence appropriately should be considered when evaluating the reasonableness of the state's conduct. Nevertheless, I would hold that events like the death of Erickson, *i.e.*, events occurring during a period of *reasonable* delay, should be excluded from the prejudice element of the analysis. Moreover, I agree with the state that the allegations of prejudice caused by Erickson's death are too speculative to merit any weight in the prejudice analysis.

I also would reject defendant's claim that he was prejudiced because his ability to impeach the victim's father and the father's girlfriend with inconsistent statements was undermined by the passage of time. Despite the majority's conclusory insistence otherwise, 331 Or at 86 n 8, defendants must demonstrate more than a "reasonable possibility" of prejudice to their defenses.

In *Mende*, this court stated:

"[Defendant] has not demonstrated any actual prejudice to his ability to prepare a defense. ·

"We speak of 'actual' prejudice because, as a practical matter, and despite [language from *Haynes* suggesting that prejudice might not be considered under the Oregon Constitution], our prior cases all have required *in effect* that

---

the *Barker* analysis. That court declined to consider prejudice caused by the death of a witness, explaining that the death occurred only one month after the defendant's indictment and arrest:

"Certainly the government cannot be charged with unreasonable delay at that point in time * * *. Considering the length of time between indictment and trial, the reasons for the continuances, appellant's failure to object to postponements until the day before he was tried, and his failure to show any substantial prejudice he suffered *because of the continuances*, we conclude he was not denied his Sixth Amendment right to speedy trial."

*United States v. Anderson*, 471 F2d 201, 203 (5th Cir 1973) (emphasis added).

there be *some degree of actual prejudice to the ability to pre-pare a defense* to the charge in order to establish a consti-tutional violation * * *."

304 Or at 22-23 (emphasis added). The wording "in effect" signaled that, although in the past the court had articulated one standard, in practice it had effectuated another. The standard set out in *Mende,* and controlling here, requires actual trial prejudice as distinct from a mere possibility of trial prejudice.

In this case, defense counsel was able to demon-strate at trial inconsistencies between statements made by the father and his girlfriend to police officers on the day of the crime and their testimony at trial. The father and his girl-friend each testified that their earlier statements to the police were made during a period of extreme emotional upset and either were incomplete or mistaken. Each denied that he or she had killed the child. Thus, the jury heard the complete testimony of all three principal suspects in this case, was alerted to the discrepancies in their testimony, and had every opportunity to evaluate their individual credibility and demeanor. Nothing different would have occurred had the case been tried 12 months earlier. As noted, the trial court expressly concluded that defendant's claim of prejudice "is a reach * * * as solid evidence supporting that [claim] is not apparent to the court." I agree. Defendant has not demon-strated the actual prejudice to his ability to prepare a defense that is required by Article I, section 10. *Mende,* 304 Or at 22.

## ASSERTION OF THE RIGHT

In *Barker,* the Supreme Court made a defendant's assertion of or failure to assert his right to a speedy trial one of the factors to be considered in speedy-trial analysis. 407 US at 528. As noted, after *Dykast,* this court no longer consid-ers a defendant's failure to demand a quicker pace in the pro-ceedings. On review of the court's opinion in *Dykast,* how-ever, I agree with the state that *Dykast* was decided incorrectly.

According to the majority:

"Abandoning *Dykast* would require us also to abandon the well-established principle that Article I, section 10, contains a mandatory directive to the state that is 'not within the disposal of the parties[.]' "

331 Or at 87 n 9. *Dykast* did not analyze the assertion issue in terms of waiving constitutionally mandated state conduct. In fact, *Dykast* contained *no* analysis of the assertion issue whatsoever. Instead, the court took the rather dramatic step of eliminating a factor from the *Barker* analysis in a footnote containing nothing more than a citation to *Vawter*, 236 Or at 87, for the proposition that "this court has consistently held that it is not incumbent upon the accused to demand a trial[.]" *Dykast*, 300 Or at 375 n 6. *Vawter*, in turn, cited to *State v. Dodson*, 226 Or 458, 466, 360 P2d 782 (1961). *Vawter*, 236 Or at 87. *Dodson*, however, was decided on *statutory*, not constitutional, grounds. The *Dodson* court explicitly declined to determine whether the rule that a defendant need not take affirmative action to procure his right should be applied where a defendant claims only a violation of Article I, section 10. 226 Or at 466. Thus, *Dodson* provides no support for the *Dykast* holding that assertion of the right is irrelevant to an Article I, section 10 analysis.

Simply considering a defendant's demands for a speedy trial or lack thereof as one of the factors in the *Barker* calculus is not equivalent to requiring a defendant to assert the right to a speedy trial at peril of waiver. The *Barker* court recognized that reality when it rejected the "demand-waiver rule" and, instead, adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." 407 US at 529-30. That balancing test specifically placed the "primary burden on the courts and the prosecutors to assure that cases are brought to trial." *Id.* at 529.

Finally, given the severity of the remedy for a speedy-trial violation, *i.e.*, dismissal *with prejudice*, it is non-sensical to allow a defendant to sit quietly as time passes—potentially weakening the state's case—only to assert an "unreasonable delay" late in the proceedings, thus preserving the issue for appeal if convicted.[4]

---

[1] Generally, delay bolsters the defense of a criminal case. *See Loud Hawk*, 474 US at 315 (passage of time may make it difficult or impossible for state to prove its

Because "unreasonable delay" analysis is intended to be flexible and to take into account *all* relevant factors,[5] this court should consider as relevant a criminal defendant's timely assertion of the right to a speedy trial, or lack thereof. By "timely," I mean at a time when the harm still may be avoided, *i.e.*, before unreasonable delay has occurred. The majority does not explain why it is unpersuaded by the arguments in favor of abandoning *Dykast.* I am troubled by the majority's failure to deal substantively with those arguments.

The majority also states that abandoning *Dykast* would require us to

"overrule *Vawter* and hold that a defendant is responsible for insuring that a case is scheduled for trial."

331 Or at 87 n 9. Abandoning *Dykast* would require neither.

As noted, the *Vawter* court's assertion that "it is not incumbent upon the accused to demand a trial or take affirmative action to enforce his right to a speedy trial" was followed by a citation to *Dodson,* which was authority only for the proposition that an accused need not take affirmative action to enforce his *statutory* right to a speedy trial. Even if we were to interpret the above sentence from *Vawter* as expanding the rule from *Dodson* to include the *constitutional* mandate (something that, as noted, the *Dodson* court explicitly declined to consider), the sentence means only that, in Oregon, the mandate regarding a speedy trial is not *waived* by a defendant's failure to demand such a trial.

The authorities cited in *Dodson* state simply that the duty of ensuring the (statutory) right to a speedy trial falls on the state, not the defendant. *See State v. Crosby,* 217 Or 393, 402, 342 P2d 831 (1959) (bringing a case to trial timely "is in the hands of the prosecutor and the court, not the defendant"); *State v. Chadwick,* 150 Or 645, 650, 47 P2d 232 (1935)

---

case beyond a reasonable doubt); *Barker,* 407 US at 521 (delay is not an uncommon defense tactic; delay may work to the defendant's advantage). In this case, it is interesting to note that, although the state's second appeal was dismissed in January 1994, defendant's counsel did not inquire about the status of the case until April 1994.

[5] "The point of the [*Barker*] formula is that all relevant criteria be examined and not overlooked or ignored." *Haynes v. Burks,* 290 Or 75, 81, 619 P2d 632 (1980).

("The law imposes no duty on a defendant * * * [to insist that his or her case] be set for trial at any particular time. That duty devolves upon the state."). Placing the duty to move forward on the prosecutor and the courts rather than on the defense does not preclude consideration of evidence of the defense's desire to move forward (or lack thereof) as a factor in a test for a constitutional violation. *See Barker*, 407 US at 528 ("[T]he better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right."). Although it is not *incumbent* on a defendant to demand a trial, doing so can be *helpful* to that defendant in making out a speedy-trial claim. Recognizing that a defendant's desire or lack of desire for a speedy trial is relevant to a speedy-trial claim (even though a defendant does not waive the right to a speedy trial by failing to demand one), neither requires us to overrule *Vawter* nor requires us to hold that a defendant is responsible for insuring that a case is scheduled for trial.

## CONCLUSION

In summary, the trial court explicitly found that both the state's appeals were taken in good faith, were not taken to vex or frustrate defendant's desire for an expeditious trial, and were not taken to gain a judicial or competitive advantage over defendant in the trial. I read the majority opinion essentially to agree with all those findings.

Although the pretrial delay in this case is lengthy, an analysis of the *Barker* factors does not lead me to the conclusion that defendant is entitled to the severe remedy of dismissal with prejudice. *See Barker*, 407 US at 522 (characterizing that remedy as "unsatisfactorily severe"). In my view, there was strong justification for the state's appeals. The combination of the importance of the suppressed evidence to the state's case, the seriousness of the crimes charged, and the absence of actual trial prejudice, strongly suggests to me that the majority holding in this case is an unwarranted reaction to the majority's conclusion that the District Attorney and the Attorney General fumbled the ball. The majority holding results not in justice being administered "completely and without [unreasonable] delay," but, rather, in justice

being completely denied. The majority analysis has the potential to chill the state's ability to pursue in good faith statutorily authorized and important pretrial remedies in the prosecution of serious criminal cases.

My dissent in this case should not be read as an endorsement of the manner in which the District Attorney and the Attorney General handled this case. The state was negligent. However, I cannot agree that that negligence reached constitutional dimensions. On this record, I am not persuaded that defendant has shown that he was deprived of his state constitutional right to have "justice" administered "completely and without [unreasonable] delay." Accordingly, I would proceed to consider defendant's other arguments under this particular assignment of error and, if appropriate, his other assignments and arguments on review.

I dissent.