DE MUNIZ, C. J.,
concurring.
A significant portion of this case turns on the polygraph consent form that defendant signed while at the Newberg Police Station. My agreement with both the outcome here and the analysis used to reach it stems in large part from the fact that defendant has never argued that the terms of his consent were unclear, or that he was misled by the form he signed, or that the effect of his signature had somehow been misrepresented to him.
I write specially, however, to note that nothing in Oregon law currently prescribes a uniform text for criminal polygraph consent forms, nor requires law enforcement officials to explain the reach and effect of that consent to the defendants from whom they solicit it. The result can be added layers of litigation and expense in criminal matters that might have been avoided — or at least truncated — had all the *726 relevant aspects of a defendant’s consent been unambiguously presented as a required prelude to the polygraph examination itself.
The polygraph consent form discussed briefly in footnote 3 of the majority’s opinion illustrates some of my concerns. The text is set out below. It provides:
“I,_, do hereby voluntarily, without duress, coercion, promise of reward or immunity, submit to a polygraph examination. I have had the technique of polygraph testing explained to my satisfaction. I further authorize the release of the results of said examination and the information obtained to those parties having an interest in this examination. I understand that I cannot be forced to take this test by anyone and I have the right, at any time, to leave the examination room. I also understand that Polygraph Examinations are not generally admissible in a court of law. I also understand that this examination can at anytime be recorded by audio or video type recordings. To the best of my knowledge, I have no physical or mental condition which would prevent me from taking this examination.
“I also understand the following:
“1. I have the right to remain silent.
“2. Anything I say can and will be used against me in a court of law.
“3. I have the right to talk to a lawyer and have him present with mewhile I am being questioned.
“4. If I cannot afford to hire a lawyer, one will be appointed torepresent me at no cost before any questioning, if I wish.
“5. I can decide at any time to exercise these rights and not answer any questions or make any statements.”
The form, of course, arguably serves double duty; signing it is meant to signal voluntary consent to a polygraph examination while acknowledging notice of the accompanying Miranda warnings. In practice, however, the manner in which Miranda warnings are presented to polygraph examinees can frequently obfuscate the clarity of the rights they are intended to convey, while muddying the scope of the examinee’s consent.
*727 First, it is easy for the importance oí Miranda warnings to be tacitly downplayed before a polygraph test begins. Here, for example, after pointing out the written Miranda warnings that were part of the consent form used in this case, the polygraph examiner immediately explained,
“I deal with people that are in custody, um, that are at the jail, all the time, in Multnomah County. I do these at Multnomah County Jail all the time.”
On the one hand, that statement could be viewed as small talk designed to put a test subject at ease. On the other, it could be viewed as implying that the Miranda warnings on defendant’s consent form were surplus provisions, a statement of rights only for, and applicable to, polygraph test subjects who were already incarcerated. Whatever motive was at work, of course, is of no moment here; defendant adequately demonstrated that he understood his rights by his own voluntary recitation prior to his polygraph examination. Had that not been the case, however, the motivation behind the polygraph examiner’s statement could easily have become another issue for our courts to resolve, increasing both the time and money needed to conclude this matter. Those resources are becoming scarcer with each passing biennium; in my view, they should not be expended on matters that could be avoided altogether by simply requiring clarity and candor to be integrated as policy requirements in conducting criminal polygraph examinations.
Second, the scope of examinees’ Miranda rights is rarely explained to examinees prior to criminal polygraph examinations. Again, this case could be used to illustrate the problem. After defendant had completed his test, the polygraph examiner informed him that several of his answers had been deceptive. What followed were a string of interrogatories: Had defendant forgotten to mention something that would explain those results? Did defendant want to get something off his chest? In and of themselves, those questions are inoffensive — unless, of course, the one being questioned is unaware that he or she does not have to answer. It is not uncommon for examinees to receive some form of invitation to shrive themselves after a polygraph test, regardless of its *728 outcome. There is nothing, however, in most polygraph consent forms — certainly not in the one used in this case — that alerts examinees to the likelihood of that kind of post-test interrogation, much less the applicability of their Miranda rights in those circumstances.
And finally, the terms of consent presented to examinees often serve only to increase the ambiguity of the Miranda rights that they are then called upon to acknowledge. Here, for example, the following statement was on the consent form defendant signed: “I also understand that Polygraph Examinations are not generally admissible in a court of law.” Is that a reference to the fact of the examination, the results of the examination, or something else altogether? Should examinees infer that anything they say immediately before, after, or during their tests will be inadmissible — or not? When those questions are raised, it is the job of our courts to sort them out. It is difficult, however, to speed the plow in that regard when ambiguity becomes the rule rather than the exception.
To reiterate: My complaint is not that the vagueness surrounding consent in polygraph cases renders the resulting information involuntary; it is that such vagueness can unnecessarily raise the cost of adjudicating criminal matters in Oregon, sometimes to levels that are simply unacceptable. In State v. Harberts, 331 Or 72, 11 P3d 641 (2000), the Oregon Supreme Court overturned an aggravated murder conviction and death sentence because of the state’s failure to bring the defendant to trial “without delay” as required under the Oregon Constitution. Much of the five-year period at issue in that case had been taken up in pretrial litigation over the voluntariness of statements made by the defendant immediately after his polygraph test.
We can and should do better. Requiring informed consent in criminal polygraph examinations to be truly “informed” as a statutory matter would go far toward making that so.