Argued and submitted January 17, 2019; portion of judgment requiring
defendant to pay a $2,255 DUII fine vacated, remanded for resentencing,
otherwise affirmed April 7, 2021

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# CHRISTOPHER SHANE RALSTON,
aka Christopher Wayne Ralston,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR33180; A165924

486 P3d 822

Defendant appeals his conviction for driving under the influence of intox-
icants. In his first assignment of error, defendant argues that the trial court
erred in denying his motion to dismiss because his right to a speedy trial under
Article I, section 10, of the Oregon Constitution was violated from a 14-month
delay that resulted in the loss of video evidence. In defendant's second assign-
ment, he argues, and the state concedes, that the trial court erred in imposing a
$2,255 fine in the judgment when it orally imposed a $2,000 fine at sentencing.
*Held*: As to the first assignment, the trial court did not err in denying defendant's
motion to dismiss. Although the length of the delay factor weighs against the
state in the Article I, section 10, analysis, the remaining factors do not. The unex-
plained period of delay was relatively small and not intentional, the remaining
period of delay was reasonable and justified, and defendant failed to establish a
reasonable possibility of prejudice. While there is some probability that the miss-
ing evidence was favorable, whether that missing evidence can be shown to be
material is uncertain. As to the second assignment, the Court of Appeals agreed
with and accepted the state's concession that the trial court erred in imposing a
fine in the judgment in an amount that exceeded its oral pronouncement in court.

Portion of judgment requiring defendant to pay a $2,255 DUII fine vacated;
remanded for resentencing; otherwise affirmed.

Richard Baldwin, Senior Judge.

Kyle Krohn, Deputy Public Defender, argued the cause
for appellant. Also on the brief was Ernest G. Lannet, Chief
Defender, Criminal Appellate Section, Office of Public
Defense Services.

Peenesh Shah, Assistant Attorney General, argued the
cause for respondent. Also on the brief were Ellen F.
Rosenblum, Attorney General, and Benjamin Gutman,
Solicitor General.

Before Powers, Presiding Judge, and Egan, Chief Judge, and James, Judge.

JAMES, J.

Portion of judgment requiring defendant to pay a $2,255 DUII fine vacated; remanded for resentencing; otherwise affirmed.

**JAMES, J.**

Following a conditional guilty plea, defendant was convicted of felony driving under the influence of intoxicants (DUII). ORS 813.010(1);[1] ORS 813.011. Defendant appeals that judgment, raising two assignments of error. In his first assignment, defendant argues that the trial court erred in denying his motion to dismiss because his right to a speedy trial under Article I, section 10, of the Oregon Constitution[2] was violated from a 14-month delay that resulted in the loss of video evidence. For reasons we later explain, we reject that argument and affirm. In defendant's second assignment, he challenges the trial court's imposition of a $2,255 fine in the judgment when it orally imposed a $2,000 fine at sentencing. We agree with and accept the state's concession that the trial court erred in that regard. We therefore vacate the portion of the judgment imposing the $2,255 fine, remand for resentencing, and otherwise affirm.

The following facts are largely procedural and undisputed.[3] At 12:29 a.m. on June 3, 2016, Officer Nafie stopped defendant's vehicle for failing to maintain a lane. Nafie smelled a strong odor of alcohol and noticed that defendant's eyes were bloodshot and watery and that his speech was slurred. There were multiple open containers in the back of defendant's vehicle, he admitted to having a few drinks,[4] and he declined to perform field sobriety tests (FSTs). At 12:40 a.m., Nafie arrested defendant and transported him to the police station. At 2:06 a.m., defendant refused to submit

---

[1] ORS 813.010 was amended subsequent to the pertinent events in this case. *See* Or Laws 2017, ch 21, § 80. However, because the conduct in this case occurred before the effective date of those amendments, and because those changes are not otherwise relevant to this appeal, they do not apply to this case. *See* Or Laws 2017, ch 21, § 127 (amendments "apply to conduct occurring on and after the effective date of this 2017 Act").

[2] Article I, section 10, provides: "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

[3] What occurred during the stop is taken from the police report, which is not part of the record. However, the parties summarized that report in their legal memoranda related to defendant's motion to dismiss before the trial court, and those facts are not contested on appeal.

[4] It is unclear whether it was before or after his arrest that defendant admitted to drinking, but resolution of that fact is not necessary to our analysis.

to a breath test and, at 2:32 a.m., defendant was booked into the Multnomah County Detention Center (MCDC) on the charge of misdemeanor DUII, ORS 813.010.[5]

The same day that defendant was booked into MCDC, he was arraigned on charges of misdemeanor DUII and reckless driving, held in custody, and given a future court date of July 8, 2016. On or around that same day, the misdemeanor Deputy District Attorney (DDA) handling defendant's case informed a felony DDA within the office that defendant might have prior DUII convictions that would enhance the DUII to a felony and indicated that she would order defendant's prior convictions. *See* ORS 813.011 (providing that DUII is a Class C felony when a defendant has at least two prior DUII convictions within 10 years of the date of the current offense). On June 8, defense counsel appeared at the Multnomah County Circuit Court's Criminal Procedures Court (CPC) and requested a hearing for defendant to enter a plea to the misdemeanor charge. However, at that plea hearing, the state dismissed the case because it had determined that it was likely to proceed as a felony. Defendant was also released from custody.

On June 9, the felony DDA received defendant's file that included copies of defendant's certified prior DUII convictions. Approximately one month later, on July 8, the felony DDA reviewed defendant's file and confirmed that defendant's DUII should be charged as a felony. On July 19, a grand jury indicted defendant for felony DUII, ORS 813.011, and reckless driving, ORS 811.140, and the court issued a warrant for defendant's arrest.

On July 20, the Multnomah County Sheriff's Office (MCSO) entered the warrant into various local and

---

[5] ORS 813.010, in relevant part, provides:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"* * * * *

"(b) Is under the influence of intoxicating liquor ***[.]

"* * * * *

"(4) [T]he offense described in this section, driving while under the influence of intoxicants, is a Class A misdemeanor and is applicable upon any premises open to the public."

national law enforcement computer databases. Because defendant resided in Clark County, Washington, on July 29, MCSO sent requests to the Clark County Sherriff's Office (CCSO) and the Battle Ground Police Department asking them to "attempt to serve the *** warrant"[6] at defendant's Washington address. Further, on August 15, MCSO mailed defendant a "Notice of Arrest Warrant" to that same address, notifying him that Multnomah County had issued a warrant for his arrest on felony DUII and reckless driving charges and directing him to contact the court with any inquiries. MCSO maintains records of returned mail, and there was no record that that letter had been returned.

On January 4, 2017, CCSO notified MCSO that defendant was in custody there on both local Washington charges and Multnomah County's warrant. On January 5, defendant signed a waiver of extradition, agreeing to be returned to Oregon from Washington. On March 16, defendant was transported to Multnomah County. On March 17, defendant was arraigned, released from custody, and given a court date of April 28, 2017, to return, and the same defense attorney was reappointed.[7] In addition, the Oregon eCourt Case Information Network (OECI), the official Oregon Judicial Department register for the circuit courts, reflects an entry on March 21 for "Motion—Pretrial Discovery[;] Demand," and, on April 28, "Hearing-Custody Issue."

On May 1, defense counsel learned that defendant's jail booking video from his June 3 arrest was no longer available due to the jail's policy of overwriting videos after 30 days. On July 25, defendant filed a motion to dismiss the case, arguing that his speedy trial rights under Article I, section 10, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution, were violated. As part of that motion, defendant argued that the state's delay in prosecuting the case, beginning from the day the misdemeanor information was filed, was unreasonable, and that he was prejudiced because the booking video was destroyed in between the dismissal of the misdemeanor

---

[6] We omit the use of all capitalization for ease of reading.

[7] A new attorney within the same office was eventually substituted.

information and the issuance of the felony indictment, and that the video would have aided his defense.

The state responded that defendant's Sixth Amendment claim did not begin to run until the indictment issued on July 19 and, due to the jail's 30-day policy, the video was likely overwritten before the speedy trial clock began to run. Regarding defendant's Article I, section 10, claim, the state noted that it was an open question whether the speedy trial clock began to run at the time the misdemeanor information was filed or the felony indictment issued, but it argued that defendant's motion should nonetheless be denied. The state contended that the delay was not unreasonable, and that defendant failed to establish that he was prejudiced, because it would be speculative to conclude that what was contained on the video would help rather than hurt defendant's case.

The hearing occurred on August 18, 2017, and the parties relied primarily on their written legal memoranda, which included declarations, affidavits, and exhibits. The state's memoranda provided declarations from both the felony and misdemeanor DDAs and exhibits establishing the timeline of events, including the state's efforts to serve the warrant. The felony DDA did not explain why, after receiving defendant's file on June 9, she waited until July 8, nearly one month, to review it. Further, the state provided no explanation why, after defendant signed the waiver of extradition on January 5, 2017, he was not transported until March 16. Lastly, the state did not present any evidence or argument about its efforts to prosecute the case after March 17, the day defendant was arraigned on the felony indictment, and August 18, the day of the hearing.

Defendant's motion included an affidavit from Randy Rowlette, MCSO's "Systems Administration Senior." Rowlette attested that, on the day defendant was booked, MCDC's booking area had five or more cameras digitally recording inmates performing various activities in the booking process, such as removing clothing and shoes and filling out paperwork. Further, Rowlette stated that those booking videos are available for "thirty days or more" before

the system automatically overwrites them, and defendant's booking video was no longer available.

Defense counsel also provided a declaration stating that Nafie's police report did not contain any descriptions of defendant exhibiting poor balance or walking, which she "frequently" sees in police reports that are describing impairment. Based on that, she believed the booking video would have been helpful to the defense at trial. She further stated that she has previously used MCDC jail booking videos in DUII trials, those booking videos demonstrate a defendant's ability or inability to walk and balance, including "standing on one foot and removing a shoe while maintaining balance." She also attested that in her experience, those booking videos, as objective evidence, are "uniquely persuasive" in DUII trials.

The trial court concluded that the overall length of time, and the 30 days it took the felony DDA to review defendant's file, was "not unusual." The trial court accepted the assertions in defense counsel's affidavit regarding what jail booking videos show "normally for people without regard to what it particularly would have shown for [defendant]." Ultimately, the trial court denied defendant's motion, concluding that defendant did not make "an adequate factual showing that the *** overwritten video would have been helpful to the [d]efense."

On August 29, defendant entered a conditional plea of guilty to Count 1, felony DUII, reserving the right to appeal the denial of his motion to dismiss, and Count 2, reckless driving, was dismissed. Although the trial court orally imposed a $2,000 fine, the court's written judgment imposed a $2,255 "Fine-DUII."

On appeal, beginning with defendant's first assignment, defendant abandons his argument under the Sixth Amendment, and solely argues that the 14-month delay, which resulted in the loss of his booking video, violated his right to a speedy trial under Article I, section 10. The state disagrees, arguing that the court properly denied defendant's motion to dismiss. For the following reasons, we agree with the state.

We review a trial court's denial of a defendant's motion to dismiss for lack of a speedy trial for errors of law, keeping in mind that we are bound by a trial court's findings of fact if evidence in the record supports them. *State v. Johnson*, 342 Or 596, 608, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008).

At the outset, defendant asks us to determine when the speedy trial clock began to run in this case. Defendant argues that the clock began on the day the misdemeanor information was filed and not the day the felony indictment issued. He argues that this case requires us to determine whether the speedy trial clock begins to run upon the filing of the first or second charging instrument, which is an open question in Oregon. *See, e.g.*, *State v. Chelemedos*, 286 Or App 77, 81, 398 P3d 415, *rev den*, 362 Or 208 (2017) (noting unresolved issue). The state argues that we need not resolve that issue because, even assuming the clock was triggered on the date the misdemeanor information was filed, the difference amounts to approximately one month, which would not affect the outcome. Ultimately, we agree with the state that we need not resolve the matter—albeit for a slightly different reason. It is evident that here, the parties and the trial court treated the filing of the misdemeanor information as the date the speedy trial clock began. No party challenged that holding at trial, nor on appeal. Therefore, this case does not require us to resolve that open question in Oregon. For purposes of this case, we calculate the relevant time from the filing of the misdemeanor information, and whether a subsequent felony indictment would "reset" the clock is a question we leave for another day.

Article I, section 10, provides, in relevant part, that "justice shall be administered, openly and without purchase, completely and without delay." In determining whether a defendant was denied a speedy trial under that provision, we consider three factors: (1) the length of the delay, (2) the reasons for the delay, and (3) the prejudice to the defendant. *State v. Emery*, 318 Or 460, 472, 869 P2d 859 (1994).

In some instances, the length of the delay alone can be dispositive. If the length of the delay is so "manifestly excessive" that it "shocks the imagination and conscience,"

or if the state caused the delay with the intent to impede the defense, the delay alone may establish a speedy-trial violation and no further analysis is necessary. *State v. Olstad*, 218 Or App 524, 528-29, 180 P3d 114 (2008) (internal quotation marks omitted). However, if the time taken to bring an accused to trial was not an intentional impediment by the state, and was not so long as to shock the conscious, but still "substantially greater than the average," we must proceed to assess the other two factors—the reasons for the delay and the prejudice to the defendant. *State v. Bayer*, 229 Or App 267, 279, 211 P3d 327, *rev den*, 347 Or 446 (2009) (internal quotation marks omitted).

The inquiry is "fact-specific," and requires us to "examine the circumstances of each particular case," and then assign weight to each factor. *State v. Harberts*, 331 Or 72, 87-88, 11 P3d 641 (2000). In assessing each factor, "[w]e do not balance the elements one against the other. Instead, we examine the relevance of each in giving effect to the constitutional guarantee of a speedy trial." *State v. Rohlfing*, 155 Or App 127, 132, 963 P2d 87 (1998). "That examination is informed in part by the duration of the delay, so that a longer delay could cause the reasons for the delay or prejudice to defendant factors to weigh more heavily in defendant's favor." *State v. Siegel*, 206 Or App 461, 467, 136 P3d 1214 (2006) (citing *State v. Mende*, 304 Or 18, 24, 741 P2d 496 (1987) (internal quotation marks omitted)). Delays caused by a defendant "do not weigh heavily, if at all, against the state." *State v. Wendt*, 268 Or App 85, 100, 341 P3d 893 (2014) (internal quotation marks omitted). Delays caused by the prosecutor, or the court, require us to determine "whether there [was] a justification for those delays and whether that justification [was] reasonable." *Id.* "[N]eutral reasons for delay receive less weight than reasons caused by negligence, but they must nonetheless be weighed against the government because the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Siegel*, 206 Or App at 467 (internal quotation marks omitted). However, delays that are reasonable and justified do not qualify as neutral delay and do not "militate in favor of dismissal." *State v. Fleetwood*, 186 Or App 305, 316, 63 P3d 42 (2003).

There are several issues not in dispute. The state concedes that, for purposes of this appeal, a 14-month delay is not so insignificant that we need not consider the other factors. Further, defendant does not argue that the delay was intentional, or that the length alone is manifestly excessive so as to shock the conscience, requiring dismissal. We therefore move on to consider the factors of the reasons for the delay and the prejudice to the defendant, noting that the length of the delay weighs against the state. *See Johnson*, 342 Or at 608 (explaining that where the length of the delay is substantially greater than the average, the length of delay factor weighs against the state).

*Reasons for Delay.* Beginning with the reasons for the delay, defendant contends that the state failed to explain the 14-month delay, and the state disagrees. We conclude that the state failed to explain approximately three and one-half months of the delay, with the remaining period of delay being explained, reasonable, and justified.

The first relevant period is between June 3, 2016, the day the misdemeanor information was filed, and July 19, the day the felony indictment issued, totaling one month and 16 days. One month of that period is unexplained. The state contends that that period was attributable to the state investigating whether it could pursue felony charges and that it "expeditiously" obtained an indictment once that determination was made. However, what the state does not explain is why, after having received defendant's file on June 9, the felony DDA waited 30 days to review it. In concluding that the 30 days is "not unusual," the court incorrectly focused only on the length of the delay without considering whether the state provided any *explanation* for that delay. *See Fleetwood*, 186 Or App at 316 (in determining whether a period of delay was reasonable and justified for purposes of Article I, section 10, of the Oregon Constitution, the court looked to the merits of and time spent on the state's appeal).

We can agree, generally, with the trial court's conclusion that a 30-day delay for a DDA to review a file may be reasonable when considering the high-volume caseloads many Oregon district attorney offices handle. *See State v. Dykast*, 300 Or 368, 377, 712 P2d 79 (1985) ("We are not

unaware \* \* \* of the heavy caseloads in many district attorneys' offices."). However, that conclusion is not a truism that always applies. Here, it is worth noting, the file contained everything necessary to determine if this case was chargeable as a felony—all that needed to occur was opening the file. Additionally, the reasons for that period of delay take on particular relevance in this case because, if the video was overwritten on day 30 following defendant's June 3 arrest, the video would have been lost on July 3. Thus, the video was likely destroyed after the felony DDA received defendant's file but before she had reviewed it. In other words, as the parties agree on appeal, it was that 30-day delay that caused the destruction of the video. In that light, we cannot conclude that the state adequately explained this delay by relying solely on office workload. More was required here, and therefore, one month of that total period of delay was without explanation and weighs against the state.

The next period of delay is July 19, 2016, the day the warrant issued, and January 4, 2017, the day MCSO learned defendant was in custody in Washington, totaling five months and 16 days. Defendant argues that that period of time was unexplained. The state disagrees, arguing that it obtained an arrest warrant the day the indictment issued, entered the warrant into law enforcement databases the following day, and then "served the warrant by mail less than a month later on August 15, 2016."

As an initial matter, we reject the state's argument that the state served the warrant when it mailed the Notice of Arrest Warrant on August 15. Putting aside whether an arrest warrant could be served by mail, the letter MCSO mailed to defendant's address notified him that there was a pending warrant for his arrest out of Multnomah County for felony DUII and reckless driving and gave defendant instructions to call the court with questions. It did not purport to serve the warrant.[8] Nonetheless, the state took sufficient steps to serve the warrant, including promptly obtaining a warrant on July 19, the same day the indictment was

---

[8] Although we do not decide whether the warrant was served the day defendant was taken into Washington custody on the warrant or after he was extradited from Washington to Oregon, we also note that, according to OECI, the warrant service return was not filed until March 17, 2017.

returned; entering the warrant into local and national law enforcement databases the following day, July 20; promptly asking two different Washington law enforcement agencies on July 29 to serve the warrant; and, on August 15, mailing defendant notice of the warrant. Thus, given the facts of this case, including that MCSO was coordinating with out-of-state law enforcement agencies to serve the warrant, the five-month and 16-day delay was explained and reasonable. *See State v. Gonzales-Sanchez,* 251 Or App 118, 124, 126, 282 P3d 19, *rev den*, 352 Or 666 (2012) (concluding that the state "made sufficient efforts" to serve the warrant for purposes of a statutory speedy trial claim where it did not have defendant's out-of-state mailing address and it entered the warrant into two law enforcement databases); *State v. Green*, 140 Or App 308, 315 n 9, 915 P2d 460 (1996) (noting that the "unreasonable delay test [for determining whether a prosecution was initiated within the statute of limitations under ORS 131.135] is the same as the speedy trial analysis under Article I, section 10" (internal citations omitted)); *State v. Pirouzkar*, 98 Or App 741, 743-44, 780 P2d 802 (1989), *rev den*, 309 Or 333 (1990) (determining that a seven-month delay between the issuance of a warrant and an unsuccessful attempt to serve the warrant was not an unreasonable delay for purposes of commencing a prosecution within the statute of limitations period, ORS 131.135, where the state had entered the warrant into local and national law enforcement databases two and one-half months after the warrant issued).

The next period of delay is January 5, 2017, the day defendant signed the waiver of extradition, and March 16, the day he was transported to Oregon, totaling two months and 11 days. That period is unexplained. We recognize the potential obstacles the state might encounter in returning a defendant who is incarcerated in another state on local charges from that state. However, we will not assume that those potential difficulties were, in fact, the source of the delay. For example, it could be that the local charges remained pending during that period and, therefore, Washington would not agree to return defendant until the local charges resolved. Just as likely, however, is that the local charges resolved, and Washington was waiting for

Oregon to provide defendant's transport. This type of delay requires the state to carry its burden to explain the reasons for the delay, which did not occur here. Therefore, that two month and 11-day period is unexplained and weighs against the state.

The final period of delay is March 16, the day defendant was transported to Oregon, and August 18, the day of the hearing on defendant's motion to dismiss, totaling five months and two days. Although the parties do not specifically address this period, the record supports a determination that that period of delay is reasonable. On March 17, the day after defendant was transported from Washington to Oregon, he was arraigned on the indictment, appointed an attorney, released from custody, and given a next court date of April 28. A next court date 42 days out is not unusually long for a felony prosecution. *See State v. Peterson*, 252 Or App 424, 428, 430, 287 P3d 1243 (2012) (noting that there is "nothing unreasonable about a 40-day interval between the commencement of a misdemeanor case and the setting of a first status conference" for purposes of statutory speedy trial). After that, OECI reflects that on March 21 defendant filed a demand for pretrial discovery and, on April 28, defendant appeared before the court on a custody issue. Next, defendant filed his motion to dismiss on July 25, and the hearing on that motion occurred on August 18. Defendant resolved his case by plea on August 29. That period of delay is attributed to the normal steps in the criminal justice process, was not unduly lengthy, and was attributed partly to defendant's motion, and is, therefore, reasonable and justified. *See State v. Dixon*, 224 Or App 66, 73, 75, 197 P3d 1106 (2008), *rev den*, 346 Or 10 (2009) (concluding that, for purposes of a statutory speedy trial claim, a six-month period "arose out of routine delays," including "one month from indictment to arraignment, a one-month delay to appoint substitute counsel, and a four-month delay from the first court appearance to the first scheduled trial date").

Overall, three months and 11 days of the 14-month delay, which was unexplained but not the result of any intentional misconduct, weighs against the state. *See Green*, 140 Or App at 315-16 (determining that, although a delay of 33 months between indictment and defendant's arrest was

unexplained and the result of the state's negligence, "in the absence of intentional misconduct it [did] not weigh heavily" in the Article I, section 10, speedy trial analysis). The remaining approximately 11-month period was explained and the result of reasonable and justified delays. Therefore, the reasons for the delay factor does not weigh in favor of dismissal and, as the parties agree, defendant's claim rests on whether he has established a sufficient degree of prejudice to warrant dismissal. *See Emery*, 318 Or at 471-73 (concluding that the two-year delay in bringing defendant to trial was attributed to the state, but, because there was no intentional misconduct, the Article I, section 10, inquiry "turn[ed] on \*\*\* whether defendant was prejudiced by the delay"). We turn to that question.

*Prejudice.* Under Article I, section 10, defendant has the burden of demonstrating that, as a result of the delay, he suffered one of three kinds of prejudice: "excessive pretrial detention, anxiety and stress resulting from the public accusation of a crime, and impairment of the ability to present a defense at trial." *Wendt*, 268 Or App at 101. Of those, "the last is the most serious, because the inability of a defendant adequately to prepare a case skews the fairness of the entire system." *State v. Tiner*, 340 Or 551, 555, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007). Defendant asserts the third type of prejudice from the loss of the booking video.

To claim that lost evidence impaired the ability to present a defense at trial, a defendant must show a "reasonable possibility of prejudice." *Id.* at 555. "However, when the value of unavailable evidence is only speculative, the unavailability of that evidence will not factor significantly in the analysis." *Johnson*, 342 Or at 608.

Here, defendant argues that he met his burden to show a reasonable possibility of prejudice[9] because he estab-

---

[9] Defendant argues that the lost video evidence is comparable to the loss of an eyewitness. And, at one point he notes that,

"[t]he Supreme Court has explained that, '[i]f a witness dies or disappears during the delay, the prejudice \*\*\* is obvious.' *Harberts*, 331 Or at 86 (quoting *Barker v. Wingo*, 407 US 514, 532, 92 S Ct 2182, 33 L Ed 2d 101 (1972)). *In any other case*, the defendant 'needs to show only that the delay caused a reasonable possibility of prejudice to the ability to prepare a defense.' *Id.*"

lished that the video would have been helpful to his defense. For support, defendant points to defense counsel's affidavit showing that, based on her experience trying DUII cases, which included reviewing police reports and MCDC booking videos and using those videos at trial, the omission from Nafie's report of defendant exhibiting balance issues supported a reasonable inference that the video would have been helpful. Specifically, the video would have allowed him to refute the testimony of the officer—the state's only witness to testify about defendant's impairment—and create reasonable doubt that he was impaired, which, he argues, is sufficient to establish a reasonable possibility of prejudice.

The state disagrees raising two main arguments. First, it contends that defendant's argument as to the video's helpfulness is based on speculation, because its content, including its quality, is unknown. Second, the state argues that, even if that argument is not speculative, he "could have achieved a similar effect" rebutting the state's evidence of impairment by cross-examining the officer that he "made no observations of impaired balance or walking and that such observations are normally included in other police reports in DUII cases." Thus, according to the state, defendant failed to establish sufficient prejudice justifying dismissal.

We begin by rejecting the state's argument that the officer's testimony would have been an adequate substitute for the booking video. Although *State v. Zinsli*, 156 Or App 245, 966 P2d 1200, *rev den*, 328 Or 194 (1998), is based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution and otherwise has no bearing on this case, we find it helpful in illustrating the unique quality of video evidence. There, the defendant was charged with DUII, and the state lost the videotape of the defendant's FST performance. *Id.* at 247-48. Responding to the defendant's motion to dismiss based on the lost videotape, the state had argued that the defendant could introduce his FST performance through the testimony of the arresting

_____

(Second internal quotation marks omitted; emphasis added.) Although defendant otherwise agrees he must establish a "reasonable possibility" of prejudice, to the extent he also argues there is a presumption of prejudice when a witness dies or disappears, which should apply in this case, we reject that argument for reasons we later explain.

officer and his report. *Id.* at 253. We rejected that argument, explaining:

> "In general, the prosecution of a DUII case depends heavily on the opinion of the arresting officer in determining whether a defendant's mental or physical faculties were adversely affected to a noticeable or perceptive degree. Here, in the absence of the videotape, a jury would have only [the officer's] interpretation of defendant's performance of the FSTs, demeanor, appearance, and speech patterns, which, as noted, were to some extent not noticeably affected by alcohol. Of course, defendant may, but does not have to, offer his own version of the events to rebut [the officer's] conclusions and the Intoxilyzer results. However, defendant's testimony is not an acceptable substitute, because defendant's testimony carries the risk that the jury will view that testimony as extraordinarily self-serving, whereas that risk is not present in the videotape evidence. Accordingly, the videotape evidence is unique because it would provide defendant with an objective video replay of the events from which a jury *could draw its own conclusions.*"

*Id.* at 253-54 (internal quotation marks and citation omitted; emphasis in original).

For similar reasons articulated in *Zinsli*, Nafie's testimony would have been an insufficient substitute for the booking video. Here, defendant sought to prove that he was walking without any balance or coordination issues and, unlike cross-examining Nafie about omitting that defendant exhibited difficulties walking in his police report, a video showing defendant walking with proper balance would have been *affirmative evidence* to establish that fact. For example, attempting to prove that defendant had no walking or coordination issues by impeaching the officer would have required the jury to make an intermediate inference to draw the ultimate inference that defendant sought—that the officer omitted any mention of defendant's balance or coordination issues *because* he wasn't exhibiting any. However, the officer could have provided an alternative explanation as to why he omitted any mention of that in his report, including that it was a simple oversight. And, as an adverse witness, the officer would have had a motive to provide an alternative explanation for that omission. In that scenario, the jury would have had to make a credibility determination whether

it believed the officer's explanation for the omission or defendant's explanation. However, watching the booking video would not have required the jury to make any credibility determinations or draw intermediate inferences to decide whether defendant was exhibiting any balance or coordination issues. The jury could watch the video and "*draw its own conclusions.*" *Zinsli*, 156 Or App at 254 (emphasis in original).

It is also worth noting that the unique value of video evidence in criminal prosecutions today is the reason local law enforcement agencies across the nation are implementing, or being ordered to implement, policies requiring body cameras to be worn by officers and dash cameras to be installed in police vehicles. *See* United States Department of Justice, The United States Attorney's Office, District of Oregon, *Department of Justice Awards Over $500,000 to Oregon Law Enforcement Agencies for Body-Worn Camera Programs*, Press Release (Oct 11, 2016), https://www.justice.gov/usao-or/pr/department-justice-awards-over-500000-oregon-law-enforcement-agencies-body-worn-camera (accessed Mar 31, 2021) (noting that then-Attorney General Loretta E. Lynch awarded grants to "establish and enhance law enforcement body-worn camera programs across the United States"); *Floyd v. City of New York*, 959 F Supp 2d 668, 685 (SDNY 2013) (ordering the New York City Police Department to require patrol officers in the precincts with the highest number of stops in 2012 to wear body cameras for one-year because body cameras "are uniquely suited to addressing the constitutional harms at issue" in that they "provide a contemporaneous, objective record of stops and frisks," which "may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie").

The critical facts necessary to decide many of the legal issues in criminal prosecutions, like the lawfulness of a stop or search, or to determine whether a defendant committed the charged crime like a DUII or resisting arrest, often depend upon what occurred at the time of the stop. And frequently it is only the officer and a defendant present when the stop occurs. Video recordings, therefore, can be

uniquely powerful pieces of evidence because they create "an irrefutable record of what occurred during stops." *Floyd*, 959 F Supp 2d at 685 n 65; *see State v. Merriman*, 410 SW3d 779, 792-93 (Tenn 2013) ("A video recording from a patrol vehicle is unique by its very nature. No evidence comparable to this video recording could have been obtained through other means."); *see, e.g.*, *Bostic v. State*, 332 Ga App 604, 606-08, 774 SE2d 175, 178-79 (2015) (concluding that officer did not have probable cause to arrest defendant for DUII because a videotape of the traffic stop, which contradicted some of the officer's testimony at the suppression hearing, showed that the defendant's gait was "steady and otherwise normal," he answered all of the officer's questions, his speech was clear, and his eyes were not bloodshot and watery).

We turn to whether defendant established that the lost video would have been helpful. We note, at the outset, that the state's characterization of defendant's argument regarding the video as "speculation," simply because the video's contents are unknown, is not helpful. When considering lost evidence, parties are always, on some level, speculating. This area of the law is highly nuanced—seeking to draw the impossibly fine line between permissible and impermissible inference.

It is an understatement to say that a defendant attempting to show that he suffered prejudice from evidence that was lost or destroyed faces a seemingly impossible task, and parties and courts are well-served by recognizing the difficultly faced by defense counsel in these situations—situations that, by definition, only come about when there has been unexplained delay caused by the state. The Supreme Court has acknowledged that difficulty, explaining that "[p]roof of actual prejudice is often quite difficult" when a defendant is attempting to show prejudice "where witnesses or records have disappeared or memories have dimmed." *State v. Ivory*, 278 Or 499, 507-08, 564 P2d 1039 (1977); *see Doggett v. United States*, 505 US 647, 655, 112 S Ct 2686, 120 L Ed 2d 520 (1992) ("[I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." (Internal quotation marks omitted.)); *Barker v. Wingo*, 407 US 514, 530, 532, 92 S Ct 2182, 33 L Ed

2d 101 (1972) ("Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown."); *see also California v. Trombetta*, 467 US 479, 486, 104 S Ct 2528, 81 L Ed 2d 413 (1984) (in determining whether there has been a due process violation "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed"). To address that reality, the Supreme Court adopted a test that requires a defendant to show a "reasonable possibility" of prejudice. *Ivory*, 278 Or at 508. Nonetheless, the difficulty remains—precisely *how* does a defendant provide nonspeculative proof that lost evidence—which is no longer available and, therefore, impossible to know with certainty its contents or substance—would be helpful to show a reasonable possibility of prejudice.

In distilling the analytical rule that governs prejudice in the speedy trial context, we must acknowledge that the decisions in this area do not always fit neatly beside one another. It does not serve the bench or bar to pretend that there is not tension in precedent. That tension exists here. Nevertheless, our task is to reconcile that precedent into a coherent rule. To that end, we turn to the following cases for guidance.

In *Wendt*, we concluded that defendant failed to show a reasonable possibility of prejudice from the loss of witnesses and dimmed memories. 268 Or App at 103-04. There, the defendant was charged with DUII, first-degree manslaughter, and third-degree assault. After watching a band perform at a bar, defendant drove home and his vehicle collided with another car, causing the death of his passenger and injury to two victims in the other vehicle. *Id.* at 88. Shortly after the incident, the state interviewed a witness who had observed defendant in the bar and was videotaping the band, although the state never obtained the video. Days before trial, that witness told the prosecutor that the video had captured a conversation between defendant and his passenger before they left the bar discussing whether they should be driving, which was then disclosed to the defendant. *Id.* at 90. Before trial, the defendant moved to dismiss the case on speedy trial grounds, arguing that the

delay impaired his ability to present a defense because certain witnesses, who were at the bar and who his investigator had interviewed near the time of the incident, could no longer recall certain details and could have, if their memories were not impaired, helped the investigator identify and locate other witnesses seen on the video. *Id.* at 91-92.

   In rejecting defendant's prejudice argument, we began by summarizing two Supreme Court opinions, *Tiner* and *Johnson*:

   "[In *Tiner*,] the defendant argued that a delay impaired his defense because a potential witness who had died during the delay 'might have testified that a gun sold to [the defendant's friend] (and transferred to [the] defendant) was of a different caliber than the weapon that had killed [the] victim.' The court concluded that the loss of that potential witness did not cause a reasonable possibility of prejudice. In the court's view, '[t]he gun-sale witness's potential testimony was speculative' because the defendant 'never located him and, above all, never determined what he might have had to say.' The Supreme Court reached the same result in *Johnson*, where the defendant argued that, because his aunt had died while his case was pending, he could not present her testimony during the penalty phase of his trial. The defendant acknowledged that '[i]t is not possible to know what she might have said,' but argued that 'it is highly likely that [she] would have had something kind to say.' The Supreme Court concluded that speculative testimony of that sort was not enough to establish a reasonable possibility of prejudice."

*Wendt*, 268 Or App at 102-03 (citations omitted).

   We held that the defendant's theory that the lost witnesses would have provided favorable testimony rested on the same type of speculation as that in *Tiner* and *Johnson*. *Id.* at 103. Our decision there turned on *materiality*, or value. We explained that the defendant "was required to point to some evidence—something more than mere speculation— as to the *value* of those potential witnesses' testimony." *Id.* at 102 (emphasis in original). We continued by noting that, despite defendant's investigator having interviewed several people in the bar that night, the "[d]efendant made no showing that others (who could be seen or heard on the

video but had not yet been identified) had any interaction with defendant on the night in question," or had observed him closely enough to provide relevant or helpful testimony. *Id.* at 103. We similarly rejected the defendant's arguments that, had the memories of the witnesses who were in the bar on the night of the incident and interviewed by the defense investigator not faded, those witnesses could have provided corroborating testimony that defendant was not impaired. *Id.* at 103-04. We explained that the defendant did not provide any evidence whether those witnesses were in a position to observe defendant or otherwise know any details related to his level of intoxication. *Id.* at 104. Further, with regard to the lost memory of those witnesses, we explained that, because defendant did not provide any information about what they had said previously to the investigator when interviewed near the incident, or provide any information about the specific facts or circumstances forgotten, "there [was] no way to determine whether the earlier statements are materially different—and more beneficial to defendant's case—than their statements[.]" *Id.*

*Harberts* came to the opposite conclusion. In that case the defendant was charged with aggravated murder and, after being held in jail for five years between his arrest and trial, he was convicted and sentenced to death. 331 Or at 74. The defendant lived with the victim's father, the father's girlfriend, and the victim. On the night of the murder, while everyone was asleep in the house, the defendant claimed that he found the victim's body lying on the bathroom floor when he awoke to use the bathroom. *Id.* No direct evidence linked the defendant to the crime, and his theory at trial was that the victim's father had killed the victim, either alone or with his girlfriend. *Id.* at 94.

The defendant claimed that he was prejudiced from the delay in two ways. First, the father and his girlfriend's testimony at trial in 1994 regarding details of the night of the murder were inconsistent with their statements near the time of the murder in 1989, and they claimed that they could not remember what they had told the police because too much time had passed. *Id.* at 94-95. The defendant argued that the passage of time had provided them both with a "plausible excuse" for not remembering what they had told the

police, which undermined his ability to impeach their credibility with prior inconsistent statements. The court agreed, concluding that it "is not speculative to say that successfully impeaching their credibility could have established some doubt about whether the police properly had eliminated the father and the father's girlfriend as suspects." *Id.* at 95.

Second, defendant argued that he was prejudiced by not being allowed to cross-examine the investigator who had died during the delay about "how thoroughly he had searched the [father and his girlfriend's] bedroom, what he saw, or whether [the investigator] could have overlooked evidence in the bedroom that would have created a reasonable doubt that defendant had killed the victim." *Id.* at 95-96. In concluding that defendant had established a reasonable possibility of prejudice, the court emphasized that the investigator had "unique knowledge" of the bedroom because he was the only detective who searched it, and his report failed to describe the extent and nature of the search. *Id.* at 96-97 (internal quotation marks omitted). The court noted that the "defendant was not required to show that [the investigator] would have said anything exculpatory. It is sufficient that defendant was deprived of the opportunity to demonstrate potential weaknesses in the state's case." The court concluded that the defendant's "impaired ability to impeach the credibility of the father and the father's girlfriend, and his inability to cross-examine [the investigator], created a reasonable possibility of prejudice to the defense." *Id.* at 97.

Similarly, in *Ivory*, the Supreme Court concluded that defendant had shown a reasonable possibility of prejudice from the loss of witnesses.[10] 278 Or at 507-09. In that case, the defendant was secretly indicted for selling narcotics 10 and one-half months before he was arrested. At the hearing on his motion to dismiss, the defendant testified

---

[10] The state argues that *Ivory* is of questionable continuing validity because the Supreme Court modified *Ivory*'s adoption of the federal speedy-trial analysis in *Barker*. *See Harberts*, 331 Or at 87 ("Although this court endorsed the *Barker* analysis in *Ivory*, it subsequently acknowledged that not all the *Barker* analysis is appropriate for evaluating claims under Article I, section 10," including that a defendant is no longer required to demand a speedy trial.). Nonetheless, it is undisputed that the remaining *Barker* factors adopted in *Ivory* remain the Article I, section 10, speedy trial test in Oregon, and we therefore reject that argument.

that there were three missing witnesses who were "vital to his defense of entrapment." *Id.* at 501-02. He asserted that one witness could testify to the contents of the initial conversation the defendant had with a police agent, which would show the defendant's "lack of predisposition" to sell the drugs; a second witness, who was working with the police, could testify that he solicited the defendant to sell cocaine on several occasions over an extended period of time; and a third witness, who was a dealer, would testify that the defendant was not a dealer and did not profit from the conduct involved in the charged crime. *Id.* at 502.

On appeal, we had concluded that the defendant's claim as to what the witnesses would say was "conclusory and nonfactual."[11] *Id.* The Supreme Court reversed, holding that the defendant had shown a reasonable possibility of prejudice by identifying "potentially favorable witnesses who could not be found" due to the delay. *Id.* at 508-09. The court stated that "'[i]f witnesses die or disappear during a delay, the prejudice is obvious.'" *Id.* at 508 (quoting *Barker*, 407 US at 532).

We recognize the confusion that *Wendt*, *Tiner*, *Johnson*, *Harberts*, and *Ivory* may present in determining what a defendant must show to establish a reasonable possibility of prejudice to the impairment of the defense from lost evidence. For example, the extent of the defendant's showing in *Harberts* was producing potential questions to ask the investigator regarding the search of the bedroom. However, nothing in the record established that the investigator's search of the bedroom would have supported the defendant's theory that the investigation was inadequate or that the answers to those questions would have been helpful to the defendant. Similarly, in *Ivory*, although the defendant presented some evidence by way of his testimony, the extent of his showing otherwise included an assertion that one witness, who was presumably present during the defendant and

_____

[11] We had also concluded that it was unlikely that the third witness would waive his privilege against self-incrimination and provide the testimony the defendant expected, which the Supreme Court generally agreed with. However, it ultimately concluded that there was nothing in the record establishing that the third witness was in a position to invoke that privilege. *Ivory*, 278 Or at 502 & n 1.

officer's initial drug transaction, would have corroborated the defendant's theory that he had a lack of predisposition to sell drugs. However, the defendant did not explain or point to anything in the record to show, for example, who that witness was and why it was more likely the witness would have supported the defendant's version of events and not the officer's. Further, *Ivory*'s statement that "[i]f witnesses die or disappear during a delay, the prejudice is obvious," 278 Or at 508 (internal quotation marks omitted), suggests that the court applied a presumption of prejudice when witnesses die during a delay, which the court in *Johnson* and *Tiner* made clear is not the standard.

Reconciling that varied precedential landscape, we distill the following: First, prejudice in the context of speedy trial is not binary; there are degrees of prejudice. *See Wendt*, 268 Or App at 105 (explaining that, for purpose of determining prejudice under Article I, section 10, the controlling question is whether a defendant "established a *degree* of prejudice that, when evaluated together with the reasons for delay and the length of pretrial incarceration, warrants dismissal" (emphasis in original; internal quotation marks omitted)); *see also Barker*, 407 US at 533 (None of the factors are "a necessary or sufficient condition to the finding of a deprivation of the right of [a] speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.").

Second, the possibility of prejudice is judged by assessing two parallel sliding scales: probability and materiality. For probability, a defendant must provide an explanation as to how the lost evidence would be favorable. *See Emery*, 318 Or at 474 (concluding that the defendant failed to show a reasonable possibility of prejudice because he did "not explain specifically how his ability to defend himself was prejudiced by the faded memories" of witnesses). For materiality, there must be something in the record, based on the specific facts of each case, to support the defendant's theory that the lost evidence would have been helpful to the theory of the case, in the context of how the evidence was presented at trial. *See id*. at 474 ("Defendant offered no evidence to show how the witness could have assisted him in preparing his defense.").

Third, both probability and materiality are judged, in degree, according to the totality of the circumstances of the specific facts of each case. *See Bayer*, 229 Or App at 281 (concluding that the defendant had failed to establish a reasonable possibility of prejudice from the officer's faded memory because, even if the officer had testified to what the defendant had hoped, "it could not have had a bearing on the success of defendant's suppression motion" because the court had already determined the stop was lawful); *see also Johnson*, 342 Or at 613 ("[T]he inference that defendant seeks to draw from the fact that he possessed other stolen property for trade—*i.e.*, that he came into possession of the victim's jewelry as a result of trafficking in stolen property— seems somewhat strained in light of defendant's statement to [a witness who testified at trial] that he came into posses- sion of the jewelry as a result of 'off[ing] the bitch.'").

Although direct evidence of the lost evidence's value will rarely be available, it is possible for defendants to meet their burden by producing or pointing to evidence already in the record showing circumstantially how and why the lost evidence would be material. *See, e.g.*, *Wendt*, 268 Or App at 103-04 (noting that, although the defendant claimed the lost witnesses could provide corroborating testimony that defen- dant was not intoxicated and thus not DUII, the defendant did not explain whether those witnesses "were in a position to notice" details about the defendant's level of intoxication, including whether the two bartenders had any interaction with the defendant); *State v. Whitlow*, 262 Or App 329, 345- 48, 326 P3d 607 (2014) (for purposes of establishing prejudice from preindictment delay under the Due Process Clause, the record established the substance of the detective's missing testimony because it contained the detective's report of the interview of the victim regarding the abuse, and the victim's testimony from the first trial which included incidences of abuse not contained in the detective's report; thus, it was inferable and "hardly 'speculative' to assume that an expe- rienced detective would confirm the thoroughness of his or her interview with the complainant in a sexual abuse investigation and the comprehensive accuracy of the conse- quent investigative report"); *Zinsli*, 156 Or App at 252-53 (concluding that the record established that the lost video

of the defendant's FST performance would have been help-ful for purposes of a due process violation where the officer testified that "he formulated his descriptions [in his police report] of defendant's performance of the FSTs from the lost videotape," which included notations that the defen-dant performed satisfactorily on some of the FSTs). In sum, defendants must "point to some evidence [in the record]—something more than mere speculation," to meet their bur-den to establish a reasonable possibility of prejudice from lost evidence. *Wendt*, 268 Or App at 102.

Applying those principles here, we conclude that defendant did not carry his burden to establish preju-dice. Beginning with probability, on this record, defendant showed that there was at least some probability that the missing evidence would be favorable. Defendant presented evidence that the police report did not contain any descrip-tion of defendant exhibiting poor balance or difficulty walk-ing, which defense counsel frequently sees noted in police reports describing impairment. And, defendant presented evidence that defense counsel has obtained and used prior booking videos from MCDC in prior DUII trials and that those videos demonstrate a defendant's ability or inability to walk and perform coordination tasks like standing on one foot and removing a shoe while maintaining balance, which the trial court found as fact. Further, defendant established that he was booked into MCDC approximately two hours after he was stopped, and that there were at least five cam-eras digitally recording the booking area. Defendant there-fore believed that the booking video was more likely to show defendant walking with good balance and coordination, which we conclude, based on that evidence, is a reasonable inference. Further, the value of a booking video showing defendant performing various balance and coordination tasks only two hours after being pulled over in a DUII prosecution, where the only other evidence of impairment derives from a single witness, could be powerful impeach-ment evidence.

However, defendant's showing as to the material-ity of the missing evidence is complicated by the posture of this case—arising from a plea. For some evidence, materi-ality is self-evident. But for other evidence, even favorable

evidence may be only minimally material to the dispute, depending on how a case is tried. Here, the materiality of the video is, on some level, relative to how the officer would testify concerning the missing observations in his report. In short, underlying at least one aspect of defendant's prejudice argument is that the video would have had an impeachment value against the officer's testimony. But that assumes how the officer would have testified. It is equally possible the officer would have admitted the inaccuracies, or inconsistencies, in his report. Because this case was resolved via guilty plea, the record does not contain evidence about the officer's testimony. Defendants who raise a speedy trial motion pretrial, then resolve the case with a plea, add an additional complexity to their already difficult task of establishing prejudice—showing the materiality of evidence never seen, to a trial that never happened.

Similarly, because materiality can sometimes only truly be known in the context of a tried case, not every speedy trial motion can be resolved conclusively pretrial. Certainly, in some instances, all the factors can be shown pretrial, but, in other circumstances, a court may not be able to assess materiality until after the close of the state's case. Accordingly, it may be necessary for a trial court to defer ruling on a speedy trial motion, or for prudent defense counsel to reraise the motion at the close of the case in chief.

Additionally, defendant's showing as to the materiality of the missing video here is complicated by another fact that we must consider in the totality of circumstances. Defendant, who was represented by the same law office throughout his case, was willing to enter a guilty plea five days after his arrest without having viewed the booking video. Defendant's willingness to enter a plea without having viewed the video is part of the totality, and weighs, in some measure, against claims of the video's materiality. Regardless of the video's *potential* exculpatory value, defendant's willingness to enter a guilty plea suggests that defendant didn't view the video as sufficiently exculpatory. Although that fact is not dispositive, it's relevant and one that we cannot ignore in this case.

In sum, in this case we are dealing with a relatively small period of unexplained delay. While there is some probability the missing evidence was favorable, whether that missing evidence can be shown to be material is uncertain. Although the length of the delay weighs against the state, the remaining factors do not, because the reasons for the delay were not intentional and otherwise reasonable and justified, and defendant failed to establish a reasonable possibility of prejudice. Therefore, defendant's speedy trial rights under Article I, section 10, were not violated.

We turn to defendant's second assignment, in which he argues that the trial court erred in imposing a $2,255 fine in the judgment after orally imposing a $2,000 fine at sentencing. As the state acknowledges, defendant was not required to preserve his claim of error because the error appeared for the first time in the judgment. *State v. Lewis*, 236 Or App 49, 52, 234 P3d 152, *rev den*, 349 Or 172 (2010) (preservation not required where alleged error appeared for the first time in the judgment). Further, we agree with and accept the state's concession that the trial court erred. *See State v. Zamno*, 299 Or App 270, 271, 450 P3d 57 (2019) (accepting the state's concession that the trial court erred in orally imposing a $2,000 fine at sentencing and then imposing a $2,260 fine in the judgment). Accordingly, we vacate the portion of the judgment imposing the $2,255 "Fine-DUII" and remand for resentencing. *See id.* at 271-72 (vacating portion of judgment requiring the defendant to pay a $2,260 DUII fine when court imposed a $2,000 DUII fine at sentencing and remanding for resentencing).

Portion of the judgment requiring defendant to pay a $2,255 DUII fine vacated; remanded for sentencing; otherwise affirmed.